F. M. CORZELIUS ET AL V. H. M. HARRELL.

No. A-167. Decided April 4, 1945.
Rehearing overruled May 9, 1945.
(186 S. W., 2d Series, 961.)

*Black, Graves & Stayton,* and *John W. Stayton,* all for petitioners.

*Hornsby, Hornsby & Kirk,* of Austin, for respondent.

MR. JUSTICE SHARP delivered the opinion of the Court.

This suit was instituted by H. M. Harrell to set aside certain orders of the Railroad Commission relating to the pro-

duction of natural gas from the Bammel Field in Harris County. Corzelius and Meineke, one of his lessors, intervened. The orders under attack limited production of natural gas for light and fuel purposes to twenty million cubic feet daily, and provided that production should be prorated only when the average daily production exceeded nineteen million cubic feet for a thirty-day period. The trial court, after withdrawing the case from the jury, rendered judgment: (1) cancelling the orders; (2) permanently enjoining the Railroad Commission from entering any similar orders; and (3) permanently enjoining F. M. Corzelius, one of the defendants, from producing gas under the cancelled orders or any similar orders. Upon appeal to the Court of Civil Appeals for the Third Supreme Judicial District by the intervenors only, the judgment of the trial court was affirmed. 179 S. W. (2d) 419. A writ of error was granted.

Petitioners contend that Sections 10 and 11 of Article 6008, Vernon's Annotated Civil Statutes, are unconstitutional, in that they confer purely judicial duties upon an administrative body, and cite in support of such contention the case of Board of Water Engineers v. McKnight, 111 Texas 82, 229 S. W. 301. This Court granted a writ of error on account of the holding of this Court in the case of Board of Water Engineers v. McKnight, supra.

The Articles of our Statutes involved in the case of Board of Water Engineers v. McKnight, supra, were Sections 105 to 132 of the Act of March 19, 1917, Chapter 88, General Laws 35th Legislature, Regular Session, pages 211-243, being Articles 5011 1/2f to 5011 1/2ss in the then supplement of Vernon's Texas Civil and Criminal Statutes. Such statutes became effective on June 19, 1917, and their constitutionality was attacked as being repugnant to Section 1, Article II, and Section 1, Article V, of the Texas Constitution. This Court in the opinion rendered in Board of Water Engineers v. McKnight, supra, declaring such sections of the statutes invalid, used the following language:

"* * * the precise question to be decided is whether the Legislature could confer on persons in the executive department power to determine and adjudicate the rights and priorities of claimants of water rights in the face of the constitutional prohibition against the exercise by officers of the executive department of any power properly attached to the judicial department, except in the instance expressly permitted."

On the same page the court stated:

"The provisions of our constitution were designed to render it impossible for the Legislature to accomplish such a purpose or object, until the people had evidence their assent by express constitutional authorization.

Again, in the concluding paragraph, the court stated:

"The Legislature having attempted by the statutes in question to confer on persons belonging to the executive department powers which properly attach to another department, without express permission of the Constitution, the statutes are void."

Article XVI, Section 59a, of the Constitution was adopted on August 21, 1917, and became effective on that date. It provides:

"The conservation and development of all of the natural resources of this State * * * are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto."

It will be noted that Article XVI, Section 59a, had not been adopted when the statutes involved in the case of Board of Water Engineers v. McKnight, supra, were considered. Therefore the validity of the statutes under consideration in that case was to be determined by the terms of the Constitution then in force. See 39 Tex. Jur., 20, 21; Stark v. Chaison (Com. App.), 50 S. W. (2d) 776.

The statutes relating to oil and gas involved in this case were each adopted in their present form subsequent to the adoption of Article XVI, Section 59a, of the Constitution. Article 6008, Acts 1935, 44th Leg., p. 318, Chap. 120, H. B. 266, Secs. 3 and 7, amended Acts 1941, 47 Leg., p. 117, Chap. 91, H. B. 211; Article 6049c, Sec. 7, Acts 1935, 44th Leg., p. 180, Chap. 76, Sec. 6, H. B. 782; Article 6049d, Sec. 4, Acts 1932, 42nd Leg., 4th Called Session, p. 3, Chap. 2, S. B. 1. Such statutes therefore must be considered in the light of Article XVI, Section 59a, of the Constitution, and not under the Constitution in force at the time the statutes involved in Board of Water Engineers v. McKnight, supra, were considered.

Article II, Section 1, of the Constitution reads as follows:
"The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to-wit: Those

which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

■ It was not intended by the adoption of Article XVI, Section 59a, to change the rule announced in Article II, Section 1, of the Constitution. By the use of the broad language used in Article XVI, Section 59a, the Legislature is authorized to enact such laws as are necessary to carry out the purposes for which such constitutional amendment was adopted. The statutes involved here confer upon the Railroad Commission the power to adjust correlative rights in gas fields, but all of its orders are subject to review by the courts, as provided for in Article 6049c, Section 8. In view of the broad provisions of Article XVI, Section 59a, authorizing the Legislature to pass all laws that may be appropriate for the conservation and development of all natural resources, and in view of the fact that the statutes provide for a full review in the courts of all orders entered by the Railroad Commission, we are of the opinion that the statutes which authorize the Railroad Commission to adjust correlative rights of owners in a common gas reservoir do not violate the provisions of Article II, Section 1, of the Constitution.

The oil and gas industry in this State has become enormous. There are now many separate oil and gas fields operated in this State under various conditions. The handling of this great industry and its complex problems calls for the services of trained persons. It is utterly impossible for the Legislature to meet the demands of every detail in the enactment of laws relating to the production of oil and gas. The duty to carry out the just and reasonable public policy as is provided for under Article XVI, Section 59a, of the Constitution, has been placed with the Railrod Commission. The Legislature has undertaken to comply with the foregoing provisions of the Constitution by the enactment of Title 102, Article 6004 et seq., Vernon's Annotated Civil Statutes, and has authorized the Railroad Commission to handle the details relating to the preservation and conservation of the natural resources of the State. It has been repeatedly held that the Railroad Commission is authorized to act under the many articles of the statutes enacted for the purpose of conserving and preventing waste of oil and gas. Marrs v. Railroad Commission, 142 Texas 293, 177 S. W. (2d) 941; Railroad Commission v. Wencker, 140 Texas 527, 168 S. W. (2d) 625; Gulf Land Co. v. Atlantic Refining Co., 134 Texas

59, 131 S. W. (2d) 73; Brown v. Humble Oil & Refining Co., 126 Texas 296, 83 S. W. 935, 99 A. L. R. 1107; Railroad Commission v. Gulf Production Co., 134 Texas 122, 132 S. W. (2d) 254.

We hold that the decision in the case of Board of Water Engineers v. McKnight, supra, does not control here, and the foregoing contention that the rule announced in that case controls in this case is overruled.

Corzelius contends that Sections 10 and 11 of Article 6008, properly construed, authorize the Railroad Commission to require proration to adjust correlative rights only as an incident to prevent waste, and where the question of waste is not involved there is no authority to adjust correlative rights.

■ The rule in this State recognizes the ownership of oil and gas in place, and gives the lessee a determinable fee therein. It is also held that such rule should be considered in connection with the law of capture, which is recognized as a property right, and both rules are subject to regulation under the police power of this State. Brown v. Humble Oil Co., 126 Texas 296, 83 S. W. (2d) 935, 87 S. W. (2d) 1069, and cases cited therein.

Article 6008 contains detailed specifications relating to the production and use of natural gas. Section 1 thereof reads:

"Sec. 1. Declaration of policy: In recognition of past, present, and imminent evils occurring in the production and use of natural gas, as a result of waste in the production and use thereof in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the same, this law is enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production."

Section 2 contains many definitions to guide the Railroad Commission.

Section 3 sets out in detail the rules relating to waste, defined and prohibited, and Sub-section (c) thereof is as follows:

(c) Underground waste or loss however caused and whether or not defined in other subdivisions hereof."

Section 4 relates to oil or gas wells.

Section 5 defines the Railroad Commission's authority to determine gas-oil ratio.

Section 6 contains several sub-sections authorizing the Commission to make and enforce rules and regulations.

Section 7 describes the means of limiting escape of gas encountered in well and the purposes for utilizing such gas.

Section 8 prescribes certain tests to be made and reports thereon to be made to the Commission.

Section 9 requires inspection of meters by agents of the Railroad Commission.

Since the validity of Section 10 and 11 are challenged, they are copied in full below:

"Sec. 10. It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the manner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interests:

"(a) In the prevention of waste as "waste" is defined herein:

"(b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

"Sec. 11. The Commission shall exercise the authority to accomplish the purpose designated under item (a) of Section 10 when the presence or imminence of waste is supported by a finding based upon the evidence introduced at a hearing to be held as herein provided.

"The Commission shall exercise the authority to accomplish the purpose designated under item (b) of Section 10 when evidence introduced at a hearing to be held as herein provided will support a finding made by the Commission that the aggregate lawful volume of the open flow or daily potential capacity to produce of all gas wells located in a common reservoir, is in excess of the daily reasonable market demand for gas from gas wells that may be produced from such common reservoir, to be utilized as permitted in this Article."

Section 12 requires monthly hearings by the Railroad Commission.

Sections 13, 14, 15, and 16 read:

"Sec. 13. In determining the daily allowable production for each gas well the Commission shall take into account the size of the tract segregated with respect to surface position and common ownership upon which such gas well or wells are located; the relation between the daily producing capacity of each gas well and the aggregate daily capacity of all gas wells producing the same kind of gas in the same common reservoir or zone; and all other factors which are pertinent; provided that the Commission shall not take into account the size of the tract upon which any gas well or wells are located in excess of the efficient drainage area of such well or wells, producing at twenty-five per cent (25%) of the daily productive capacity, which drainage area shall be determined by the Commission. In ascertaining the drainage area of a well, the Commission shall take into account such factors as are reflected in the productive capacity of a gas well, including formation pressure, the permeability and porosity of the producing formation, and the well bore's structural position, together with all other factors taken into account by a reasonably prudent operator in determining the drainage area for a gas well."

"Sec. 14. It shall be the duty of the Commission, after notice and hearing, to ascertain and determine the reasonable market demand for gas from gas wells to be used for light and fuel purposes and for all other lawful purposes to which sweet gas may be put under the terms of this Article and by proper order to restrict the production of gas from all gas wells in said field producing such gas to an amount equal to market demand or to an amount which may be produced without waste as otherwise defined; provided, however, the production of such gas shall in any event be restricted to the amount of the reasonable market demand therefor. In such order the Commission shall allocate, distribute or apportionate the total allowable production from such field among the various gas wells effected by the order on a reasonable basis, and as provided in Section 13. It shall likewise be the duty of the Commission to prorate the daily gas well production of sour gas produced from each common reservoir of sour gas in this State. The hearing for such purpose shall be held at the same time as the hearing pertaining to the proration of sweet gas well production. The proration of sour gas well production shall be accomplished according to the manner and method herein provided for the proration of sweet gas well production."

"Sec. 15. Nothing contained in this Article shall require that the production from any gas well with a daily natural open flow of two hundred thousand (200,000) cubic feet of natural gas or more to be restricted to a quantity less than fifty thousand (50,000) cubic feet of natural gas daily; and nothing herein shall require that the production from any gas well with a daily natural open flow of less than two hundred thousand (200,000) cubic feet of gas be reduced to a quantity less than twenty-five per cent (25%) of its natural open flow.

"In all common reservoirs producing both sweet and sour gas, no gas well shall be permitted to produce in excess of twenty-five per cent (25%) of its daily productive capacity; provided the Commission, upon a finding that reservoir conditions require that such percentage be increased to prevent waste, and that such increase will not create a drainage condition as between sweet and sour gas lands, may authorize an increase in such allowable production. Where the allowable production theretofore allocated to any well is more than fifteen per cent (15%) of its daily producing capacity, and the Commission finds that the production of its daily allowable from such well will cause waste due to the intermingling of sweet and sour gas, the Commission may order the production from such well restricted to fifteen per cent (15%) of its daily producing capacity, but this sentence shall not be construed to militate against the right of the Commission to fix the allowable production of any well below fifteen per cent (15%) of its daily producing capacity in carrying out the requirements of Sections 13 and 14 of this Act."

"Sec. 16. It shall be unlawful for any person to produce gas from a gas well as herein defined in excess of the daily allowable production in such schedule of allowable production. The rate of production from any gas well shall be deemed to be the average daily rate of production for the month."

We omit reference to Sections 17, 18, 19, 20, and 21, as they are not material to the issue involved here.

Section 22 reads: "The Commission shall be vested with a broad discretion in administering this law, and to that end shall be authorized to adopt any and all rules, regulations or orders which it finds are necessary to effectuate the provisions and purposes of said law."

These statutes have never been construed by this Court. It was held in a three-judge decision in Consolidated G. U. Cor-

poration v. Thompson, 14 Fed. Supp. 318, that in a case where waste is not involved the Commission is not authorized under this law to adjust correlative rights. The case was appealed to the Supreme Court of the United States, and that Court, speaking through Mr. Justice Brandeis, rejected the construction of this statute by the three-judge court, and in the case of Thompson v. Consolidated Gas Corporation et al, reported in 300 U. S. 55, said:

"It may be assumed that House Bill 266 should be construed as authorizing regulations to prevent waste, and to create and protect correlative rights of owners in a common reservoir of gas to their justly proportionate shares thereof, free of drainage to neighboring lands. It may be assumed, also, that the statute, so construed, is a valid exercise of the State's undoubted power to legislate to those ends; and that it validly delegates to the Railroad Commission authority to promulgate regulations therefor."

The law under consideration states in detail the manner and method the Commission may follow in prorating and regulating the daily gas well production from each common reservoir. The Legislature recognized the difficulty of prorating and regulating the production of gas from a common reservoir. To make sure that the Commission was not to be bound by any narrow, technical rules in carrying out the objects of this law, the Legislature was particular to give the Commission broad discretion in the exercise of its power under the provisions of this law.

Article 6029 in part reads as follows:

"The Commission shall take and enforce rules, regulations or orders for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof, including rules, regulations or orders for the following purposes:" Then follow nine sub-sections, which are not copied here.

In addition to the broad powers delegated to the Railroad Commission in Articles 6008 and 6029, Article 6042 provides as follows:

"Particular powers herein granted to the Commission shall not be construed to limit the general powers conferred by law, and until set aside or vacated by some order or decree of a court of competent jurisdiction, all orders of the Commission as to any matter within its jurisdiction shall be accepted as prima facie evidence of their validity."

Section 10 of Article 6008 contains the following language regarding how the Commission shall prorate:

"* * * The Commission shall prorate and regulate such production for the protection of public and private interests:

"(a) In the prevention of waste as 'waste' is defined herein;

"(b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

■ The Railroad Commission is not required in administering the oil and gas statutes to be absolutely accurate in its rules and orders. This would be impossible. It is the duty of the Commission to treat all interested parties justly and impartially, and the actions and rulings of the Commission in attempting to accomplish such results will not be disturbed by the courts unless such rules or orders are clearly illegal, unreasonable, or arbitrary. The power to make rules rests exclusively with the Railroad Commission. Courts may adjudge that a rule of the Commission is invalid, but they can not substitute a new rule for the one adjudged invalid. Brown v. Humble Oil & Refining Co., 126 Texas 296, 83 S. W. (2d) 935, 87 S. W. (2d) 1069, 99 A. L. R. 1107, 101 A. L. R. 1393; Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S. W. (2d) 73; Magnolia Petroleum Co. v. R. R. Commission, 128 Texas 189, 96 S. W. (2d) 273; Magnolia Petroleum Co. v. New Process Co., 129 Texas 617, 104 S. W. (2d) 1106; R. R. Commission v. Wencker, 140 Texas 527, 168 S. W. (2d) 625.

In Magnolia Petroleum Co. v. R. R. Commission, 128 Texas 189, 96 S. W. 273, this Court said:

"It is well settled that under the general provisions of the law the Railroad Commission acts in a quasi-judicial capacity. See Articles 6024, 6025, 6029, 6033, 6036, and 6036a, Vernon's Annotated Texas Civil Statutes. The Railroad Commission has the power to issue and cause process to be served by its own officers, to enter orders which are final, unless set aside on appeal, and to enforce its judgments which govern valuable property rights. Brown et al v. Humble Oil & Refining Co., 126 Texas 296, 83 S. W. (2d) 935, 99 A. L. R., 1107, and authorities cited.

\*    \*    \*    \*    \*    \*    \*

"This Court has repeatedly held that an order of the Railroad Commission, regular on its face, is presumed to be valid, and will be enforced unless set aside in a direct proceeding brought for that purpose; and, furthermore, it is not subject

to collateral attack. West Texas Compress Co. v. Panhandle & S. F. Ry. Co., 15 S. W. (2d) 558; Texas Steel Co. v. Ft. Worth & D. C. Ry. Co., 120 Texas 597, 40 S. W. (2d) 78, and cases cited."

The foregoing rule was reaffirmed by this Court in Magnolia Petroleum Co. v. New Process Co., 129 Texas 617, 624, 104 S. W. (2d) 1106.

In Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S. W. (2d) 73, in discussing the power conferred on the Railroad Commission by the Legislature, this Court said:

"Under our oil and gas conservation statutes 'Any interested person affected * * * by any rule, regulation or order made or promulgated by the Commission thereunder, * * * shall have the right to file a suit in a court of competent jurisdiction in Travis County, Texas, and not elsewhere, * * * to test the validity of said laws, rules, regulations or orders. * * * In all such trials, the burden of proof shall be upon the party complaining of such laws, rule, regulations or order; and such laws, rule, regulation or order so complained of shall be deemed prima facie valid.' Sec. 8 of Art. 6049c, Vernon's Civil Statutes, 1936. * * * under our oil and gas conservation statutes, the Commission being the statutory enforcement agency, must, as a general rule, also be the primary, or original statutory fact finding agency. The Commission is given the power and is charged with the duty to make original rules and orders, proper and necessary to carry out and effectuate the aims and purposes of such statutes. Under such a law, the Commission must of necessity ascertain facts and make facts findings. Of course, such fact findings may be made either expressly or by implication. In ascertaining and making fact findings the Commission exercises quasi-judicial powers."

After an analysis of the decisions and statutes relating to the power of the Railroad Commission to regulate oil and gas, it was further said:

"In connection with the above, we here again repeat and reaffirm what we said in the opinion on rehearing in Brown v. Humble Oil & Refining Co., supra; (126 Texas 314, 87 S. W. (2d) 1069, 101 A. L. R. 1393).

" 'We recognize that the Railroad Commission is authorized to make rules relating to the production of oil and gas. This Court will not undertake to prescribe any rule or standard to guide the Commission, except that its actions must be legal,

reasonable, and not arbitrary. There are many factors, facts and circumstances, which we shall not undertake to detail here, in each case and in each hearing, which must be considered, weighed and given effect, in the fair and reasonable administration of such laws, rules, and exceptions. All questions of fact are primarily for the Commission to determine.

" 'We held in the original opinion, and reiterate it here, that the Legislature enacted certain laws which declare the public policy of the State with respect to the development and conservation of oil and gas, and placed the duty upon the Railroad Commission to carry out the details. The duty is lodged with the Railroad Commission to make rules to carry out the mandates of the Legislature, and to impartially enforce them. In the exercise of its power to grant exceptions to its rules, it is the duty of the Commission to treat all interested parties justly, fairly, and impartially under all the facts and circumstances of the case; and the actions and rulings of the Commission in attempting to accomplish such results will not be disturbed by the courts, unless they are clearly illegal, unreasonable, or arbitrary. All rules and rulings of the Railroad Commission are presumed to be valid until the contrary is made to appear. If a rule of the Commission is found to be illegal or invalid by a court of competent jurisdiction, such court may so adjudge. The court cannot substitute a new rule for the one adjudged invalid. That power rests exclusively with the Railroad Commission'."

■ "To adjust correlative rights" the Commission is authorized by this law to consider many items that relate to the production of gas, and it further provides that the Commission shall consider "all other factors which are pertinent." The courts have frequently sustained the exception to Rule 37 "to prevent confiscation of property," (originally "to protect vested rights"). The criterion fixed by the Legislature relating to the adjustment of correlative rights is as definite as that fixed by law to authorize the Commission "to prevent confiscation of property" under Rule 37. Trapp v. Atlantic Refining Co., 169 S. W. (2d) 797; Nash v. Shell Petroleum Corp., 120 S. W. (2d) 522; Atlantic Oil Production Co. v. Railroad Commission, 85 S. W. (2d) 655; Gulf Land Co. v. Atlantic Refining Co., 134 Texas 59, 131 S. W. (2d) 73.

In this case we are concerned with the production of natural gas in a gas field, and also with the question of correlative rights of the various owners of properties in such field. Sub-sections (a) and (b) of Section 10 of Article 6008 are not dependent on

each other. They are coordinate, and each has its own independent standing in this law. Unquestionably we think that Section 10 of Article 6008 authorizes the Railroad Commission to prorate and regulate the daily gas well production from each common reservoir, in order to prevent waste and adjust correlative rights as provided for in such Sub-sections (a) and (b).

The order of the Railroad Commission complained of in the, trial court reads as follows:

"January 17, 1942

SPECIAL ORDER PERMITTING LIMITED WITHDRAWALS OF GAS TO MARKET AND SUBJECT THERETO ESTABLISHING A DRAINAGE UNIT AND FIXING AN ALLOCATION FORMULA BETWEEN GAS WELLS IN SAID BAMMEL FIELD, HARRIS COUNTY, TEXAS.

WHEREAS, After due notice a hearing was held on Tuesday, December 23, 1941, for the purpose of determining whether or not withdrawals of gas should be restricted or prohibited while recycling operations are being conducted in the Bammel field; whether or not a drainage unit for gas wells should be established; and whether or not a method of allocation between gas wells should be established for the Bammel field, Harris County, Texas; and

WHEREAS, From evidence adduced at said hearing, the Commission finds that limited withdrawals of gas to market, for light and fuel should be permitted and authorized from said field, not to exceed the amount of twenty million (20,000,000) cubic feet daily; and that appreciable waste will not be committed by permitting the withdrawal of said amount not to exceed twenty million (20,000,000) cubic feet daily, and that said limited withdrawal should be authorized and permitted in accordance with the provisions of House Hill No. 266, 44th Legislature, as amended; and

WHEREAS, The Commission further finds from evidence adduced at said hearing that, subject in all things to their findings that a limited withdrawal of gas to market for light and fuel should be permitted in an amount not to exceed twenty million (20,000,000) cubic feet daily, that a drainage unit for said gas wells should be fixed; and accordingly the Commission finds that a gas well producing at its rate as authorized by law and the rules and regulations of the Commission should be prorated on a one hundred and sixty (160) acre proration unit, and that said one hundred and sixty (160) acre unit will be an efficient drainage unit and will prevent waste in said field; and

WHEREAS, The Commission further finds from the evidence adduced at said hearing that, subject in all things to their finding that a limited withdrawal of gas to market for light and fuel in an amount not to exceed twenty million (20,000,000) cubic feet of gas per day should be permitted, a proration formula should be applied to said field and further finds that a proration formula, which divides two-thirds (2/3) of the production among the various gas wells in this field in accordance with the ration that the product of the pressure at the well and the acreage of the tract containing the well bears to the sum of these products for all the wells in the fields, and one-third (1/3) of the production by the ratio that the open flow potential of the well bears to the sum of the open flow potentials of all the wells in the field, should be adopted.

IT IS THEREFORE ORDERED By the Railroad Commission of Texas that effective January 17, 1942, the following rules and regulations are adopted and made applicable to the Bammel field, Harris County, Texas:

1. That a total withdrawal of an amount of gas from said field, in an amount not to exceed twenty million (20,000,000) cubic feet of gas daily, is hereby permitted and authorized to be withdrawn to go to market for light and fuel.

2. That bottom hole pressure tests on all wells in said field shall be taken each six months from and after the effective date of this order, and the results thereof reported to the Commission.

3. That, subject in all things to the authorization permitting the withdrawal of twenty million (20,000,000) cubic feet of gas daily from said field to go to market for light and fuel, the daily allowable production of gas for individual wells in the field shall be determined by dividing the allowable production for the field into two parts, the first part to represent two-thirds (2/3) and the second part, one-third (1/3), of the total allocation, and that the first part shall be distributed to the product of the acreage containing the well by the observed pressure at the well, and that the second part shall be distributed to each well in proportion to the relative producing ability of these individual wells. In no case shall more than one hundred and sixty (160) acres be allocated to any one well for the purpose of proration. Said proration of gas in this field shall apply only to net gas produced; and by the phrase 'net gas produced' is meant the amount of gas produced from a gas well or wells, less the amount of gas, if any, returned to the producing formation. The provisions contained in this paragraph shall apply

only after the net daily volume of gas produced, averaged over thirty (30) day period, has exceeded an amount of nineteen million (19,000,000) cubic feet.

4. All rules and regulations and orders, or parts thereof, heretofore promulgated and enacted by the Commission that are in conflict herewith are hereby repealed insofar and only insofar as said rules and regulations and orders are or may be in conflict with this order.

IT IS FURTHER ORDERED That this Cause be held open on the Docket for such other orders as may by the Commission be deemed necessary. and appropriate in the premises."

The following is a brief statement of the salient facts introduced in the trial court. We refer to the opinion of the Court of Civil Appeals for a more detailed statement of the facts.

The Bammel Field was classed primarily as a gas field, and covered about 3,200 acres. The Bammel Field was practically all under lease to Harrell in 1939, when he applied to the Railroad Commission for a permit to install a recycling plant. Under authority from that body, the operations were begun by drilling production wells around the periphery of the field and two injection wells in the center. The gas was taken from the production wells through the recycling plant, where the liquid hydrocarbons were extracted; then the dry gas was pumped back into the producing sand through the injection wells. The recycling plant had a capacity of thirty-five million cubic feet of gas per day, but because of an unavoidable loss of two million cubic feet per day, only thirty-three million cubic feet were reinjected into the reservoir. This continuous process had the effect of pushing the wet gas from the center of the field toward the edges where it could be produced and processed, the purpose being to extract practically all of the valuable liquids from the gas and leave only dry gas in the reservoir, with the only drop in pressure being that entailed by the daily loss of two million cubic feet of the gas. Harrell intended to forego producing the dry gas for light and fuel purposes until the recycling process had progressed to a point where it would no longer be economically feasible. In fact, the reinjected dry gas fingered out unevenly into the wet gas area, and a certain amount of blending of the wet and dry gas took place.

In October of 1941 leases belonging to Harrell on approximately four per cent. of the field lapsed, and Corzelius acquired

control of this acreage. He drilled one well thereon and began production in January of 1942, supplying gas to two distributing corporations owned by him, through a pipe line from the well to Houston. This was the first time that any permanent withdrawals had been made from the field to supply a light and fuel market, and to the time of trial it was the only outlet to a market. The average daily market demand amounted to four or five million cubic feet. By a relatively simple process, Corzelius extracted a portion of the liquids from the gas he produced before delivering it to the pipe line. This process did not recover as great a percentage of the liquids as did the recycling process.

Harrell applied to the Railroad Commission for an order prohibiting permanent withdrawals from the field until the conclusion of the recycling process; and in the alternative he asked that withdrawals be prorated. Upon a hearing the Commission found that production up to twenty million cubic feet daily would entail no appreciable waste. Therefore withdrawals up to that amount were authorized. This order was extended from time to time. After several futile attempts to obtain mandatory relief from the Supreme Court (see Harrell v. Thompson, 140 Texas 1, 165 S. W. (2d) 81), Harrell filed this suit in the form of an appeal from the above-mentioned order and the various extensions thereof.

The trial court on May 28, 1943, entered judgment as follows:

"* * * that the Railroad Commission of Texas, its Members, their successors, agents, and representatives be and they are hereby permanently enjoined and restrained from continuing in effect any of the orders herein set aside or from entering or continuing in effect any similar orders to those herein adjudged to be null and void.

" * * * that the intervenor, F. M. Corzelius, his heirs, agents, servants, representatives, employees, contractors, transferees, and assigns, be and they are hereby permanently enjoined and restrained from producing and marketing or attempting to produce and market, either directly or indirectly, any gas from the well now owned by him in the Bammel Field, Harris County, Texas, or from any other well which may be drilled or owned by him in said Bammel Field and from said field or from any of said wells under and by virtue of any of the orders herein set aside and adjudged to be null and void or under any similar order or orders of the Railroad Commission of Texas."

**5** Since this case has reached this Court it appears that the Railroad Commission, after the rendition of the judgment in the trial court copied above, amended Order No. 3-3332, dated January 17, 1942, relating to the production of gas in the Bammel Field, and on July 7, 1943, entered the following order:

"July 7, 1943

SPECIAL ORDER AMENDING ORDER NO. 3-3332 DATED JANUARY 17, 1942, TITLED 'SPECIAL ORDER PERMITTING LIMITED WITHDRAWALS OF GAS TO MARKET AND SUBJECT THERETO ESTABLISHING A DRAINAGE UNIT AND FIXING AN ALLOCATION FORMULA BETWEEN GAS WELLS IN SAID BAMMEL FIELD, HARRIS COUNTY, TEXAS.

---

WHEREAS, After due notice and hearing the Commission did on January 17, 1942, promulgate Order No. 3-3332 limiting gas withdrawals from the Bammel Field and establishing a drainage unit for gas wells from said field, and

WHEREAS, From evidence adduced at a hearing held on June 18, 1943, and from engineering tests conducted by Commission engineers in said field, the Commission is of the opinion and finds that Order No. 3-3332 should be amended.

THEREFORE, IT IS ORDERED By the Railroad Commission of Texas that effective August 1, 1943, Order No. 3-3332 titled, 'Special Order Permitting Limited Withdrawals of Gas to Market and Subject Thereto Establishing a Drainage Unit and Fixing an Allocation Formula Between Gas Wells in said Bammel Field, Harris County, Texas,' dated January 17, 1942, should be amended to hereafter read as follows:

(1) The reasonable lawful required gas production from the Bammel Field, Harris County, Texas, shall be determined by nominations for the production from gas wells producing from said field submitted to the Commission in affidavit form. Such nominations shall be bona fide and shall state the amount of gas that will be utilized for lawful purposes, and the amount that will be returned to the horizon from which it was produced. However, the Commissioner shall adjust the allowed production as determined by the method to the actual production from the field as determined from the records of the Railroad Commission of Texas, and in no event shall gas withdrawals exceed 20,000,000 cubic feet of gas daily.

(2) The daily allowable production of gas for individual wells in the Bammel Field shall be determined by dividing the allowable production into two parts, the first part to represent two-thirds (2/3) and the second part one-third (1/3) of the total allocation for the field, and that the first part shall be distributed to the product of the acreage containing the well and the observed pressure at the well. The second part shall be distributed to each well in proportion to the relative producing ability for these individual wells producing from the same horizon.

(3) For the purpose of establishing the allowable for a gas well in said field not more than 160 contiguous acres shall be assigned to any gas well; however, no acreage may be assigned to any gas well unless the designated unit including the assigned acreage is such that the distance between any two points on same is no greater than the diagonal of the rectangular unit containing an equivalent amount of acreage and having a length not greater than twice its width. A certified plat shall be filed with the Commission's Oil and Gas Division not later than July 26th, 1943, showing the acreage to be assigned each well, proven productive acreage, and the dimensions of the unit on which each gas well is located.

(4) That all gas produced from the Bammel Field shall be processed for its liquid hydrocarbons and condensates therein efficiently extracted and the residue gas either returned to said sand from which it was produced or utilized for light and fuel and other lawful uses as provided by Article 6008, Revised Civil Statutes of Texas, as amended. Provided, however, that not more than 20,000,000 cubic feet per day of the allowed production from the same Bammel Field shall be utilized for light and fuel and other lawful purposes.

(5) Each producer, purchaser, pipe line company, or operator producing or taking gas from wells classified as gas wells in the Bammel Field shall prepare regular monthly reports upon forms furnished by the Commission according to instructions contained within the reports.

(6) That the Commission will cause to be issued schedules setting forth, among other things, the company owning the individual well, the name of the lease, the well number, and the proven contiguous well acreage, the open flow capacity, and the total monthly allowable production in thousands of cubic feet.

IT IS FURTHER ORDERED That this cause be held open on the docket for such other and further orders as may be necessary and supported by evidence of record."

The foregoing order has never been attacked in the courts. The Court of Civil Appeals was not called upon to consider same when this case came before that court. It appears that the order entered on January 17, 1942, no longer controls the production of gas in the Bammel Field, but that the owners and opertors of gas wells in that field are now controlled by the provisions of the order entered by the Railroad Commission dated July 7, 1943, as copied above, which has materially changed the provisions of the order dated January 17, 1942.

Harrell in his reply to the application for writ of error prays that this Court either "grant the writ on the importance of the question involved" or "dismiss the application as moot." The judgment of the trial court is sweeping in its terms. It leaves doubt as to whether the Commission has any authority to make an order regulating the production of gas in the Bammel Field. The law unquestionably authorizes the Commission to make orders relating to that field, provided they treat the owners and operators interested in the field fairly and justly. After the trial court had entered the judgment cancelling the order dated January 17, 1942, permanently enjoining the Commission from making any similar orders, the order so condemned was amended on July 7, 1943, as copied above.

The judgment of the trial court is so broad in its terms that it would handicap if not make it impossible for the Commission to make similar orders in the future. If the order of the Commission dated January 17, 1942, was invalid in any respects, the Commission under this law had the right to enter a new order.

In the case of Dancier Oil & Refining Co. of Texas v. Railroad Commission of Texas, 122 Texas 243, 56 S. W. (2d) 1075, in passing upon the questions involved in that case as being moot, Judge Leddy writing the opinion of the Court, said:

"Courts have sometimes decided questions involving attacks upon short time orders of commissions after the same have expired by their own terms. Such cases were decided on the theory that a decision of the question as to the power of the tribunal to make the order involved might be of material value in the promulgation of similar orders in the future, and for the future reason that the person against whom such order

was made might be subjected to liability in subsequent proceedings if the legality of the order were not determined. Southern Pacific Co. v. Interstate Commerce Commission, 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283; Technical Radio Laboratory v. Federal Radio Commission, 59 App. D. C. 125, 36 F. (2d) 111, 66 A. L. R. 1355; United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 308, 17 S. Ct. 540, 41 L. Ed. 1007; Leonard v. Earle, 279 U. S. 392, 49 S. Ct. 372, 73 L. Ed. 754.

"But in this case the law under which said order was made has been materially changed; hence a decision of the questions involved in this case would be of little, if any, practical value for such purpose.

"We are inclined to the view that, although the questions involved in this case are moot, it would not be proper for this court to dismiss the writ of error. Such action would leave in effect a final judgment of the district court of Travis County adjudicating that plaintiff in error has violated a valid proration order of the Railroad Commission. In order that plaintiff in error may not be prejudiced in any subsequent proceeding by a judgment which this court has refused to consider on its merits, we think a proper disposition of the case would be to reverse the judgment of the trial court and the Court of Civil Appeals and to dismiss the cause. Alejandrino v. Quezon, 271 U. S. 528, 536, 46 S. Ct. 600, 70 L. Ed. 1071; Railroad Commission of Texas v. Alfred MacMillan et al, 53 S. Ct. 223, 77 L. Ed. 505." See Also Railroad Commission v. Wencker, 140 Tex. 527, 168 S. W. (2d) 625; International Ass'n of Machinists Union, Local No. 1488, v. Federated Ass'n of Accessory Workers, 133 Tex. 624, 130 S. W. (2d) 282.

Since the order date July 7, 1943, has not been attacked in the courts, and the Railroad Commission has been perpetually enjoined from making and promulgating any order similar to the one dated January 17, 1942, we think it proper to reverse the judgments of the trial court and Court of Civil Appeals and dismiss the cause.

The judgments of the District Court and Court of Civil Appeals are both reversed, and the cause is dismissed.

Opinion delivered April 4, 1945.

Rehearing overruled May 9, 1945.