**CLARK et al. v. BRISCOE IRR. CO.**
No. 9588.

Court of Civil Appeals of Texas. Austin.
Feb. 19, 1947.

Rehearing Denied March 5, 1947.

Grover Sellers, Atty. Gen., and E. M. De-Guerin, W. P. Watts and Geo. W. Barcus, Asst. Attys. Gen., James V. Allred, Vinson, Elkins, Weems & Francis and Victor W. Bouldin, all of Houston, for appellants.

Morris Jamison, of Houston, and Powell, Wirtz, Rauhut & Gideon, and Ben H. Powell, Jr., all of Austin, for appellee.

McCLENDON, Chief Justice.

This appeal is from a declaratory judgment decreeing in effect that the owner of a permit granted by the Board (Board of Water Engineers of the State of Texas) in April 1940, authorizing the appropriator (permittee) to divert from a Texas stream a specified amount of water for the purpose of irrigating specifically described land (the right to which appropriation has ripened into a title), is not required to apply to the Board for authority to substitute other lands for those designated in the permit, or to change the purpose of use of the water from irrigation to other lawful uses; the right of such appropriator being free of any regulation or control by the Board, so long as the new use is a beneficial one authorized by law, and does not (1) result in an increased appropriation or taking a greater quantity of water than authorized in the permit; or (2) impair the vested rights of other appropriators.

The correctness of this holding controls the decision of the case upon its merits.

Substantially, the facts are these:

April 6, 1940, the Board, upon his application and after due notice and hearing granted to R. T. Briscoe a permit to "divert, appropriate and use" not exceeding 75,000 acre-feet per annum of the unappropriated waters of the Brazos River, in Fort Bend County, "when beneficially used for the purpose of irrigation, mining, and municipal use." Not exceeding 50,000 acre-feet per annum of this amount was for the purpose of irrigating not exceeding 25,000 acres of land per annum out of a tract of 87,155 acres described by metes and bounds and situated in Fort Bend, Brazoria and Galveston Counties; with the further limitation of not exceeding in any one year "two acre-feet per acre for each acre actually irrigated within the 25,000 acres." This permit was later acquired by Briscoe Irrigation Company, plaintiff below and appellee here. The 25,000 acre-feet for mining and municipal purposes is not here involved as it was not put to beneficial use, and so decreed by the trial court. The 50,000 acre-feet was put to the beneficial use of irrigating the lands authorized in the permit; and the right thereto became vested under art. 7592, R.C.A. August 13, 1945, appellee filed with the Board an application to amend the permit so as to substitute other specified lands for those designated in the permit and to change the purpose of use so as to include mining, manufacturing, and municipal. After proper notice and hearing the Board denied this application on December 13, 1945. This suit was filed by appellee on January 8, 1946, against the Board and others, in which it sought the following relief:

1. A declaratory judgment decreeing that it was not required to obtain an amendment of its permit from the Board as a prerequisite:

a. To change the place of use of its waters in the manner alleged.

b. To change the purpose of use of its waters to include mining, manufacturing and municipal.

2. In the alternative, if it were held that an amendment of the permit was required, a declaratory judgment decreeing that the function of the Board was purely ministerial, with no discretion to deny the application; and that mandamus to compel approval of the amendment be awarded.

3. In the alternative, if the Board were held to have any discretion in the matter, a decree that the refusal of the Board was a gross abuse of its discretion, and that mandamus issue to compel approval of the application.

4. A decree (a) as between appellee and defendants other than the Board, and (b) as between appellee and the State that appellee has the right to extend its canal and supply its appropriated waters to irrigate the lands described in the application and for industrial and other lawful uses in or near Texas City or elsewhere in Galveston County.

5. A decree quieting appellee's vested title in its appropriated waters, and its right inherent therein to change the place and purpose of use thereof without interference from defendants, and that cloud upon its said title by reason of claims of defendants be removed.

During the course of the trial (to the court without a jury) all testimony offered by appellants in support of their contention that the Board had properly exercised whatever discretion it had in denying the application to amend the permit, was excluded upon objection of appellee's counsel upon the ground that the only issue in the case was whether appellee had the right to use the water for other beneficial purposes than those stated in the permit, and whether the Board had any discretion at all in such matters. This statement of appellee's counsel and ruling of the court eliminated from the case the alternative relief sought under paragraphs designated 2 and 3 above; and the court rendered judgment declaratory of appellee's rights as sought under paragraphs 1 and 4 above, and quieted the title of appellee as against other defendants than the Board as sought in paragraph 5 above.

No issue is raised questioning the perfection of appellee's title under art. 7592 to the use of 50,000 acre-feet of water authorized for irrigation purposes in the permit. Consequently, that portion of the decree quieting appellee's title thereto need not be considered.

Appellee's contention in support of the portion of the decree awarding the declaratory relief sought under paragraphs 1 and 4 above may be epitomized as follows:

■ Texas statutes governing appropriation of public waters were adopted from those of Wyoming and Nebraska and must therefore be given the same construction as had been given them by the courts of those states prior to their adoption in Texas (See Board of Water Engineers v. McKnight, 111 Tex. 82, 229 S.W. 301, 304). Under such prior holdings in those states, where the appropriation of waters authorized in a permit had ripened into a vested title, the owner of the permit had the untrammeled and unrestricted right to change the place and character of use of such waters to any lawful place and use thereof other than those designated in the permit, without the necessity of sanction of a board or other governing authority, absent (as in our statutes) an express statutory requirement for an amendment of the permit in these regards with approval of such governing authority.

The legal doctrine embodied in the first sentence of this epitomization is one of such general acceptance as to require no elaboration here. Its application in the McKnight case was stated thus: "The presumption is indulged that our Legislature was aware of the fixed judicial interpretation of the statutes in the states from which they were copied, and having been adopted, as thus construed, their validity is to be determined in the light of such construction." If, therefore, our statutes, in the respects in question, were copied from those of other states, in which, at the time of their enactment here there was a "fixed judicial interpretation" thereof in those states to the effect as contended by appellee and decreed by the court below, then it would follow that the decree in these regards is correct. Otherwise, our statutes must be construed by applying generally accepted rules of interpretation to the language employed and the objectives in view.

In an elaborate brief which evidences able, exhaustive and painstaking research, and which is most interesting and instructive, appellee's counsel have presented a learned treatise upon the origin and development of water rights law in the several western states, as gleaned from custom, statutes, adjudicated cases, standard texts, and the works of eminent specialists upon the subject. This has been most helpful in resolving the issues and reaching the conclusions essential to a proper decision in the case. We do not deem it necessary to do more than briefly summarize this origin and development, and even that only in the respects and to the extent necessary to a clear statement of the essential conclusions we have reached.

We are dealing here only with appropriated waters, consequently riparian rights are not involved and need not be discussed.

The appropriation system of water rights law seems to have had its origin in customs of the miners in some of our western states in the decade preceding the Civil War. These customs were later crystallized into statutes which authorized appropriation by giving certain notice by posting, stating the place and purpose of use of the waters. Such appropriation, when followed by the prescribed use, gave the appropriator a vested right or title, as of the date of the notice, to use of the waters thus appropriated, which was superior to that of any subsequent appropriator. This right or title was perpetual, unless lost by abandonment, was assignable, and carried with it as an incident of title, the right to change the place and purpose of use at the pleasure of the appropriator, to any lawful place or purpose of use other than that designated in the original notice. This was the generally accepted view, as expressed in statutory enactments and judicial decisions under the notice system. This view is not questioned by appellants.

The first permit statute appears to have been passed by Wyoming in 1895, Laws 1895, c. 45, which was the prototype of those later passed in other states. It was followed in the same year by Nebraska.

Laws 1895, c. 69. These are the states from which it is contended, and may be conceded for our present purposes, the original Texas permit statute of 1913, and the later 1917 more elaborate statute were in large measure, at least, copied. These statutes prescribed the purposes for which appropriation might be had, and delegated to a governing agency the function of passing upon the right to the permit. Their provisions need not be further detailed here. We have carefully examined all the authorities cited by appellee in support of the trial court's decree, and we do not find that any of them either involved or decided the specific question posed by the decree here involved. It is conceded that this question is one of first impression in this State. The cases which appear to be most strongly relied upon by appellee are: Farmers' & Merchants' Irrigation Co. v. Gothenburg Water Power & Irrigation Co., 1905, 73 Neb. 223, 102 N.W. 487; Johnston v. Little Horse Creek Irrigating Co., 1904, 13 Wyo. 208, 79 P. 22, 70 L.R.A. 341, 110 Am.St.Rep. 986; and State of Wyoming v. State of Colorado, 298 U.S. 573, 56 S.Ct. 912, 80 L.Ed. 1339.

The Nebraska case was one between two rival appropriators whose rights accrued under the notice system and prior to the permit statutes. We quote from the opinion [73 Neb. 223, 102 N.W. 488]: "Under the law existing in 1894, the defendant had the right to extend its ditch and change the use of the water so as to use it all for irrigation purposes, instead of for power, if it so desired; and therefore the holding of the board of irrigation and the district court that it had a prior right to the use of the whole 200 inches of water is correct. But since the irrigation (permit) law of 1895 has been enacted, under its provisions, by which the water must be attached to the land, it is incumbent upon the defendant clearly to *specify in its application the identical lands upon which the water has been applied.* The section of the statute allowing an extension of the ditch or a change of the place of use *must be construed together with the provisions of the 1895 law,* and while a prior appropriator may change the place of use of water which had already been appropriat-

ed, *it can only do so under the permission and subject to the administrative control of the board of irrigation.*" (Emphasis added.)

The opinion was by a Supreme Court Commissioner. Its approval was given in a per curiam opinion of the Supreme Court, reading: "For the reasons stated in the foregoing opinion, the decision of the district court as to priorities is approved, and the cause reversed and remanded, with directions to ascertain and set forth in the decree the specific lands to which the appropriation of the defendant attaches, and for such further proceedings as may be necessary to that end."

Not only did the rights there involved accrue under prior posting laws, but the court held in the above quotation that the rights acquired under the prior laws were subject to and governed by the provisions of the 1895 permit law, under which, as construed by the court (and as subsequently enacted by statute) the water rights for irrigation purposes attached to the land designated in the appropriation authorization. It is not contended that this is now, or ever has been, the law of this State; except where governed by contract between appropriator and landowner (art. 7559).

The Wyoming case also was a contest between appropriators and involved an appropriation prior to statehood.

Appellee quotes the following from State of Wyoming v. State of Colorado, the author of the opinion being Mr. Justice Van Devanter, an acknowledged "authority on land and water laws in the Western States" [298 U.S. 573, 56 S.Ct. 917]: "In both Colorado and Wyoming water rights acquired by appropriation are transferable, in whole or in part, either permanently or temporarily; and the use of the water may be changed from the irrigation of one tract to the irrigation of another, if the change does not injure other appropriators. The rules in this regard are but incidental to the doctrine of appropriation."

■ There is no question but that this is an accurate statement of the law both generally and as applied to the case there at bar. That was a contest between two sovereign states, representing both themselves and appropriators under their respective laws. No issue regarding the power or right of control of the individual state over appropriations acquired under its laws was involved.

■ Nor is there any question but that a water right, when acquired and perfected either under the posting or permit system, constitutes a vested interest in or title to the use of the water thereby appropriated. Which interest or title is assignable (except where attaching to specific land) and carries with it the incident right to change the place or purpose of use to any lawful place or purpose of use other than that designated in the original appropriation, subject only to such regulations and restrictions as may be imposed by the laws of the state granting the appropriation. Since we do not find, as regards statutes of other states from which our permit appropriation laws were copied, any adjudication to the effect that, absent an express statutory requirement, the exercise of this right of change of place or purpose of use is absolute, and not subject to any regulation or control of the governing board, the question here must be determined by an examination of our statutes upon the subject.

Our permit laws were first enacted in 1913. In 1917 a more comprehensive statute was enacted. This latter was designed, among other things, to provide for the determinination of existing water rights upon the several water courses in Texas, and for the preservation of a permanent record thereof. In this regard the statute was a copy of those previously adopted in Nebraska and Wyoming. In the McKnight case the validity of the statute in these respects was challenged and it was held invalid on the ground that it attempted to confer upon the Board (an administrative body) judicial powers in violation of Sec. 1 of art. II of our Constitution, Vernon's Ann.St., even though the right of judicial review of the Board's orders was given. It is interesting to note that, although these provisions of the Act were given the construction previously given them by the

courts of Nebraska and Wyoming, the decisions of those states upholding them were not followed. The 1917 Act was passed prior to the 1917 conservation amendment to the Constitution, art. XVI, Sec. 59a, and in the recent case of Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961, it was held that the McKnight decision was limited to statutes passed prior to that amendment, and that subsequent statutes conferring quasi-judicial powers upon administrative boards in connection with our conservation laws, where judicial review was given, were not violative of Constitution art. II, Sec. 1.

All of our water appropriation laws were passed subsequently to the 1917 constitutional amendment. That is, they were either re-enacted by being carried forward into the 1925 codification, or were enacted subsequently thereto. Const. art. XVI, Sec. 59a, reads, in part, as follows: "The conservation and development of all the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its over-flowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto."

■ All of our water appropriation laws having been passed subsequently to the adoption of this amendment they must be construed in the light of it and of its objectives, both expressed and implied.

The following statutory provisions we regard as controlling of the question at issue. All emphasis is supplied.

Art. 7466 declares the public policy of the state in accordance with the 1917 amendment.

Art. 7467 declares that the ordinary flow and underflow, and the storm, flood and rain waters of every river or natural stream, etc., within this State, and the right to the use thereof "are hereby declared to be the property of the State, and the right to the use thereof may be acquired by appropriation in the manner and for the uses and purposes hereinafter provided, and may be taken or diverted from its natural channel for any of the purposes expressed in this chapter."

Arts. 7470 and 7470a prescribe the following as the purposes for which water may be appropriated: irrigation, mining, milling, manufacturing, development of water power, construction and operation of waterworks for cities and towns, public parks, game preserves, recreation and pleasure resorts, power and water supply for industrial purposes and plants and domestic uses.

Art. 7471 provides: In the conservation and utilization of water declared to be the property of the State, the public welfare requires not only the recognition of uses beneficial to the public well-being, but requires as a constructive public policy, a declaration of priorities and appropriation thereof. These priorities so declared are: (1) Domestic and municipal uses; (2) uses to convert material from a lesser to a greater value; (3) irrigation; (4) mining; (5) hydro-electric power; (6) navigation; (7) recreation and pleasure.

Art. 7472c reads: "Conservation of water resources for public welfare

"In the administration of laws provided for the maximum judicious employment of the State waters in the public interest, it shall be the duty of the State Board of Water Engineers, or other administrative agency designated for the service by the State, *to conserve this natural resource in the greatest practicable measure for the public welfare;* and recognizing the Statutory precedent established for granting the privilege to take and utilize the waters of the State for uses recognized and authorized, it shall be the duty of the State Board of Water Engineers or other agency of the State designated for the purpose to

observe the rule that as between applicants for rights to use the waters of the State, preference be given not only in the order of preferential uses declared, but that preference also be given those applications the *purposes for which contemplate and will effectuate the maximum utilization of waters and are designated and calculated to prevent the escape of waters without contribution to a beneficial public service."*

Art. 7472d reads: "Surveys to disclose measure and potential availability of water resources

"It shall be the purpose and policy of the State and of the enactments in accord therewith, in effecting the greatest beneficial utilization of waters of the State, to cause to be made all surveys essential to disclose the measure and potential availability of the water resources of the State to uses recognized; and *to ascertain from necessary investigation the character of the principal requirements of the distinct regional division of the watershed areas of the State for the uses herein authorized, to the end that distribution of the right to take and use the waters of the State may be more equitably administered in the public interest, and privileges granted for the uses recognized may be economically co-ordinated, achieving the maximum of public value from this resource; and recognizing alike the distinct regional necessities for water control and conservation, and for control of harmful floods."*

Art. 7492 requires that every person, etc., who desires to acquire the right to appropriate unappropriated waters "shall before commencing the construction, enlargement or extension of any dam," etc., "in connection with the storage, taking or diversion of water, make an application in writing to the Board for a permit to make such appropriation, storage or diversion."

Art. 7493 reads: "Such application shall be in writing and sworn to; shall set forth the name and post-office address of the applicant; the source of water supply; *the nature and purposes of the proposed* use; the location and description of the proposed dam, lake, reservoir, headgate, intake, pumping plant, ditch, canal or other work; the time within which it is proposed to begin construction, and the time required for the application of the water to the proposed use; and, *if such proposed use is for irrigation, a description of the lands proposed to be irrigated, and, as near as may be, the total acreage thereof."*

Art. 7494 requires filing maps and other data in connection with the application.

Art. 7495 reads: "Nothing in this Act shall be held or construed to require the filing of an application or procuring of any permit for the alteration, enlargement, extension or addition to any canal, ditch, or other work that does not contemplate, or will not result in, an increased appropriation, or the use of a larger volume of water, but before making any such alteration, enlargement, extension or addition, the person, association of persons, corporation or irrigation district desiring to make same, shall file with the Board of Water Engineers a detailed statement and plan for the information of the board, of the work proposed to be done."

Art. 7506 makes it the duty of the Board to reject the application if (inter alia) it *"is detrimental to the public welfare."* The wording of this article was in some respects slightly changed by amendment in 1943, Acts 48th Leg., p. 455, ch. 303, § 1. The change is, if in fact any in substance, not important here. The quoted wording was not changed.

Art. 7507 reads: "It shall be the duty of the Board to approve all applications and issue the permit asked for if such application is made in proper form in compliance with the provisions of this chapter and the regulations of said Board; and is accompanied by the fees required in this chapter; and if the proposed appropriation contemplates the application of water to any of the uses and purposes provided for in this chapter, and does not impair existing water rights, or vested riparian rights and *is not detrimental to the public welfare."*

Provisions for notice and hearing of the application are contained in arts. 7508–10, and the contents of the permit are prescribed in art. 7515 which include: *"the use or purpose for which the appropriation of water is to be made,"* and if for irriga-

tion "*a description and statement of the approximate area of the land to be irrigated; together with such other data and information as the Board may prescribe.*"

Art. 7592 provides that where an appropriator "shall have made use of the water, under the terms of such * * * permit for a period of three years * * * he shall be deemed to have acquired a title to such appropriation by limitation, as against any and all other claimants of water from the same stream, or other source of water supply, and as against any and all riparian owners upon said stream or other source of water supply."

■ The 1917 constitutional amendment, art. XVI, § 59a, evidences a clear and explicit purpose to conserve the public waters of the State and to develop their use in the public interest. To this end the express affirmative duty is enjoined upon the Legislature "[to] pass all such laws as may be appropriate thereto." This general public policy was thereafter carried forward into our water laws, which set forth the purposes for which appropriation may be acquired, the order of priority in the different uses to which the waters may be applied, and provide for the determination by the Board, not only of questions relating to whether the statutory requirements are met, but whether granting the application for permit will subserve the public interest. No right of appropriation may be acquired without application to the Board, setting forth the place and purpose of use, and a permit granted by the Board designating the place and purpose of use. The Board is charged with the duty of duly informing itself upon all matters relating to the proper performance of its duties in passing upon the application; is required to have a hearing after due notice to all interested parties; and is charged with the express duty to determine, inter alia, whether granting the permit will best subserve the public interest.

■ These statutory provisions clearly invest the Board with the power and duty to determine whether the uses for which the application is made meet the statutory objectives, including that of being in the public interest. Necessarily the determina-

tion of that issue involves the exercise of a sound and reasonable discretion. Nor is it contended that the Board has not such discretion ·in passing upon an original application.

■ Every consideration for vesting such original discretion in the Board applies with equal force for its exercise in case of change of purpose or place of use. We therefore think there is implicit in these provisions of our laws, constitutional and statutory, a vesting in the Board of the continuing duty of supervision over the distribution and use of the public waters of the State so as to see that the constitutional and statutory objectives are attained, and carrying with it the requirement that any substantial change in use or place of use not authorized in the original permit, must have the approval of the Board. Any other construction might easily result in defeat or circumvention of the objectives of the conservation laws.

■ Art. 7495, quoted above, dispensing with necessity for a permit, is expressly limited to "the alteration, enlargement, extension or addition to any canal, ditch or other work that does not contemplate, or will not result in, an increased appropriation," etc. Place and purpose of use might have been embodied in the article as easily and simply as alteration in canals and other works. The fact that they were not so embodied, in itself constitutes a manifest legislative purpose to exclude them, and has the effect of strengthening the implication in the other statutes that application to the Board for authority to make changes of this character was required. The doctrine of inclusio unius est exclusio alterius would seem to require this construction.

We hold that authority of the Board is essential to authorize a change in use or place of use from that authorized in the permit.

■ This holding is not inconsistent with a vested title in appellee to the use of the appropriated waters, nor with its right, as an incident to such title, to have the place and purpose of such use changed. The restriction upon such right of change extends only to the power and duty of the Board to determine the public policy in-

volved in such change. This power is not an arbitrary one but must be exercised with due regard to the rights of the applicant. Against the arbitrary abuse of such discretion, the applicant is not without remedy.

Whether the Board properly exercised its delegated authority and discretion in the present instance is not brought in question in this appeal. Granted (as we hold) that the Board is vested with any authority and discretion in the matter, its order is presumptively valid; and no effort was made by appellee to show it otherwise.

 Appellee contends that the Board cannot be given the power to exercise control over the vested right of change of purpose or place of use of the water, because no right of judicial review of the Board's action is given, citing the above holding in Corzelius v. Harrell, modifying or at least limiting the holding in the McKnight case. It is true that no right of review is given of orders of the Board dealing with applications for appropriation except where the water is to be taken "from any natural stream, water course, or watershed." Art. 7590. Such appeal is to the district court "of the county in which such diversion is proposed to be made." In whatever respects the change in place of use was to a watershed other than that (or those) in which the lands described in the permit are located, the right of review is given. Independently, however, of the right of review, we see no consequent impediment to the power of the Legislature, in granting the right of appropriation of State owned waters, to prescribe conditions governing their use or change in use, and delegating to the Board the authority and duty to see that those conditions are met. The Board could not be invested with the power to destroy or impair vested rights. If, therefore, the right to change the place or purpose of use were an absolute one and not subject to regulation at the time of its vesting, it may be conceded that neither the Legislature nor the Board acting under its authority, could thereafter deny or impair that right. As we construe the statutes no such absolute right was created; but only the vested right of change, subject to

such control thereof as the Legislature had prescribed. All of the statutes governing the exercise of the rights acquired under the appropriation were, as stated, in effect at the time the application was granted, and their requirements entered into and became ingredient elements of those rights, affecting their future exercise.

 Nor do we think the powers and duties conferred upon the Board in the respects in issue are in any proper sense judicial. Fact finding is not an exclusive judicial function. In respects in which discretion inheres or is vested in a governmental official or agency, fact finding is an element or ingredient essential to a proper exercise of such discretion, whether the function of such official or agency be executive, legislative or administrative. An able discussion of this subject will be found in State v. Kelly, 27 N. M. 412, 202 P. 524, 21 A.L.R. 156. Ratemaking is essentially a legislative function (Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150; Missouri-Kansas & T. R. Co. of Texas v. Railroad Commission of Texas, Tex.Civ. App., 3 S.W.2d 489, affirmed Producer's Refining Co. v. Missouri-K. & T. R. Co. of Texas, Tex.Com.App., 13 S.W.2d 679), yet fact finding is one of its essential elements. Fact finding is essential to intelligent action in most, if not all, fields of appropriate remedial legislation; and is a fruitful source of legislative investigation through committees, commissions, etc. See Watts v. Mann, Tex.Civ.App., 187 S.W.2d 917 (error ref.). Whether a power or function, which is conferred upon an official or other governmental agency, is properly classified as judicial, legislative, executive, administrative or otherwise, depends upon the inherent nature or quality of the power or function, irrespective of whether it involves discretion, and, as an incident thereto, fact finding. In the case of Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, 475, it was held that the duties conferred upon the Board "to reject all applications and refuse to issue the permit asked for if there is no unappropriated water in the source of supply, or if the proposed use conflicts with existing water rights, or *is detrimental to the public wel-*

684

*fare,"* (Emphasis added) were "ministerial duties," the remedy for refusal to perform which would be the same as in other like cases. Unless we read out of this provision as meaningless the determination of whether the proposed appropriation for the purposes and places of use set forth in the application is "detrimental to the public welfare," then necessarily the Board is invested with the power and duty to ascertain the facts relevant to that issue and with the discretion to determine the effect thereon of such facts; and, by parity of reasoning, to resolve the factual issue as to whether a proposed change in the place or purpose of use would be "detrimental to the public welfare" within the statutory meaning of that term.

 The further contention is made that the Legislature may not delegate to a non-legislative agency the duty "to determine the public policy", but must itself determine that policy, and in delegating to an agency the duty of regulation in regard thereto must prescribe definite standards and criteria for the government of such agency, in the exercise of such delegated duty. This general proposition is correct. But we do not construe the language employed in these statutes as delegating to the Board the power to determine the public policy of the State in respect to the appropriation of its waters. That public policy is expressed in the related constitutional and statutory enactments. What is delegated to the Board is to determine from the factual situation presented in each particular case, whether granting the permit would be "detrimental to the public welfare," as declared in those enactments. The criteria are the reasonably appropriate measure of fitness, aptitude or relation the use or place of use applied for bears to the public policy or "public welfare," declared in the objectives of these enactments, the prescribed uses and priorities in uses, the conservation of the waters and their application and use in the greatest serviceable manner. The criteria are as definite as the subject in its varied applications will reasonably admit, and therefore clearly meet the constitutional test invoked. A case upon practical all fours in this respect

is New York Central Securities Corp. *v.* U. S., 287 U.S. 12, 53 S.Ct. 45, 48, 77 L.Ed. 138. The opinion is by Chief Justice Hughes. The Congressional act there under consideration authorized the Interstate Commerce Commission to permit acquisition by one carrier of control of another, by certain means, whenever, in the opinion of the Commission, such acquisition "will be in the public interest." The opinion reads: "Appellant insists that the delegation of authority to the Commission is invalid because the stated criterion is uncertain. That criterion is the 'public interest.' It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. Going forward from a policy mainly directed to the prevention of abuses, particularly those arising from excessive or discriminatory rates, Transportation Act, 1920 (41 Stat. 456), was designed better to assure adequacy in transportation service. * * * The provisions now before us were among the additions made by Transportation Act, 1920, and the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. So far as constitutional delegation of authority is concerned, the question is not essentially different from that which is raised by provisions with respect to reasonableness of rates, to discrimination, and to the issue of certificates of public convenience and necessity."

Closely analogous also are the delegation of power to the Railroad Commission to adjust "correlative rights" in its gas proration orders, Art. 6008, Sec. 10(b), Vernon's Ann.Civ.St., and the exceptions in Rule 37 "to prevent confiscation," and "to prevent waste." In *Corzelius v. Harrell,*

179 S.W.2d 419, 424, this court upheld the above article against this specific attack, holding: "'To adjust correlative rights' affords as definite a criterion as that in the exception to Rule 37 'to prevent confiscation of property' (originally 'to protect vested rights'). That exception has been uniformly upheld, expressly against this particular attack. See Trapp v. Atlantic, [Refining Co.,] Tex.Civ.App., 169 S.W.2d 797, 800, error refused."

This holding was expressly approved by the Supreme Court. 143 Tex. 509, 186 S.W.2d 961 at page 968.

Under our above holding other questions presented by appellants are immaterial.

In so far as the trial court's judgment vested title in appellee in the use of the appropriated waters as against defendants other than the Board, it is left undisturbed. In all other respects that judgment is reversed and judgment is here rendered for appellants.

Affirmed in part and in part reversed and rendered.