HARRIS COUNTY WATER CONTROL & IMPROVEMENT DISTRICT NO. 58 et al., Appellants,

v.

The CITY OF HOUSTON, Appellee.

No. 13681.

Court of Civil Appeals of Texas. Houston.

May 17, 1962.

Rehearing Denied June 7, 1962.

Burford, Ryburn & Ford, Clarence A. Guittard, H. Sam Davis, Jr., Dallas, for appellants.

R. H. Burks, City Atty., John Gano, Senior Asst. City Atty., Charles F. Weaver, Asst. City Atty., Houston, for appellee.

BELL, Chief Justice.

This case originated when Harris County Water Control and Improvement District No. 58, herein called District, filed suit against the City of Houston, herein called City, asking for a declaratory judgment declaring the City had no jurisdiction to regulate the rates it charged the customers in the City that it served with water. Suit was filed July 22, 1959. On August 12, 1959, the City filed its formal answer. On January 29, 1960, the City filed its amended answer and cross-action. By its cross-action it brought in Lone Star Water Company as a party cross-defendant. At trial in September, 1960, appellants filed two trial amendments. The City asserted jurisdiction over rates to be charged by the District and asked for an injunction restraining the District from charging rates in excess of those fixed by an ordinance of the City. The City also contended that in fact the water system belonged not to the District but to Lone Star Water Company. The District and the Water Company attacked the rates as fixed as being invalid, not only because of a want of jurisdiction in the City to fix rates charged by the District, to which they contend the water system belongs, but also because procedural due process was denied it in connection with an alleged rate hearing that led to the passing of the rate ordinance.

The trial court found it unnecessary to pass on the questions as to whether the District or the Lone Star Water Company owned the system or whether it was lawful for the District to operate a water system outside of its established limits through a completely physically autonomous system. However, that court found the City had jurisdiction to fix the rates charged by the District for water sold in the City under the circumstances of this particular case. The court enjoined the District from charging rates in excess of those fixed by the City Council of the City of Houston.

We are of the view, as was the trial court, that it is unnecessary to pass on the

questions as to whether the water system belongs to the District or the Water Company, or whether it is lawful for the District to operate the system under the facts shown, because we are of the view that assuming the system belongs to the District, and assuming its ownership and operation is ultra vires and subject to being terminated in an action brought by the State of Texas, the City, under the facts of this case, has jurisdiction to fix rates charged by the District.

We think the two questions that are determinative of this appeal are:

1. Does the City have jurisdiction to fix water rates to be charged by the District to customers served by its system in the City under the facts of this case?

2. Was the District denied procedural due process in connection with the passage of the ordinance fixing its maximum rates?

The District is a water control and improvement district organized pursuant to Article 16, Section 59, of the Constitution of Texas, Vernon's Ann.St., and Articles 7880–1 to 7880–147z, Vernon's Annotated Texas Statutes. It was created after the filing of a petition with the Board of Water Engineers of Texas on December 15, 1955. The original limits of the District encompassed about 181 acres of land. Its limits were extended thereafter so that at the time material here it encompassed some 704 acres of land. The District was formed by W. D. Laird, Ernest Gates, Leland Baker and Edwin Young. They were also stockholders in Goose Creek Development Company. The land within the District was largely undeveloped but was being developed as residential property. It lies near Baytown (formerly Goose Creek) in eastern Harris County. The water system involved in this case lies in the City of Houston and is some 22 miles from the limits of the District. Physically it has no connection whatsoever with any water facility operated by the District for service of property or customers within the District.

It appears that for years prior to 1952 the Texas Water Company operated systems for the distribution of water for municipal purposes at various points in Texas and other states. One such system was the one referred to here and in our record as the "North Houston" system. It originally lay outside the corporate limits of the City of Houston. In 1956, as we will later more particularly note, part of the system was brought within the corporate limits. It is the fixing of rates for customers served from such part that is here involved. In 1952 the Texas Water Company was dissolved and ownership of the system vested in the stockholders, McArthur, Henrickson and Alexander. Ownership of the system continued thus until 1956. It is unnecessary for us, for purposes of this appeal, to go into the details of how ownership of the system finally came to the District. It suffices to say that we are assuming that ownership vested in the District on December 28, 1956, subject to a mortgage lien on the system securing a note for $1,250,000.00 payable to McArthur, Henrickson and Alexander. On February 1, 1956, at a time the "North Houston" system was owned by the above named individuals, the City passed on first reading an annexation ordinance which encompassed much of the territory served by the "North Houston" system. The territory to be annexed was changed from time to time between the passage on first vote on the ordinance and its final passage on December 31, 1956, but there was no change in the area involving the "North Houston" system.

After annexation and about October, 1958, attorneys for the District and representatives of the City commenced negotiations for the purchase of the system by the City. When the negotiations commenced Mr. Beadle of the City Attorney's office requested certain data so the City could ascertain the value of the property. Present also were Mr. Nagle of the City Water Department and Mr. Owsley who handles utility rate matters for the City. There-

after the District representatives furnished a balance sheet as of December, 1958, water rates in effect, total number of connections as of December, 1958, potential connections at vacant lots and a map of the area supplied. Later, in early 1959, the District furnished the City a map with a legend describing the mains, a schematic drawing of the two production plants and an inventory of physical properties comprising the water system broken down by years of installation and the size and material of the lines. Further it furnished a schedule of water sold by the month for the year ending October 31, 1958, a summary of bills issued active customers for this period, a schedule of actual sales during the period and the sales pro forma on a basis of 3429 customers and for 5170 customers on a basis of complete saturation development of the area. The depth the lines were buried was furnished. No statement of operating expenses was furnished.

While negotiations for purchase were in progress, the City Council on May 12, 1959 passed a resolution directing that the District be notified to appear before the City Council June 22 to show cause why it should not submit itself to a rate hearing for the purpose of determining what rate reduction, if any, should be made. The City Council appointed an Examiner to conduct the hearing. The District, through counsel, appeared and challenged the jurisdiction of the City to regulate its rates because it was a political subdivision of the State of Texas carrying on a governmental function and its board of directors had by law been given authority to fix water rates to be charged by it. Further the District contended the notice was not of a hearing to be held, but was merely notice to the District to show cause why a hearing should not be held. The hearing was recessed and the Examiner recommended to the City Council that the plea to the jurisdiction be overruled. June 23 the Council passed an ordinance finding it had jurisdiction and directing the Ex-

aminer to proceed with the hearing. A rate hearing was then called for July 13, 1959. The District, through counsel, appeared and challenged jurisdiction. A subpoena duces tecum had been issued and served on Ernest M. Gates, Secretary of the District, commanding him to appear with certain designated books and records of the District. Mr. Gates did not respond to the subpoena. The records were not produced and the District refused to produce the records until a court should determine the City Council had jurisdiction and until a court should order production of the records. The hearing was commenced and the Assistant City Attorney introduced the motion of May 12, 1959 directing that the District show cause on June 22 why it should not submit to a rate hearing, a letter from the City Secretary sending a certified copy of the motion to the District, the motion passed by the Council ordering issuance of the subpoena duces tecum, a copy of the subpoena issued and the officer's return showing service. Then a general offer of all action taken by the City Council relating to the calling of a rate hearing was made. The hearing was then recessed until July 24. When the hearing was resumed the City introduced, over the District's objection, a letter from Mr. Owsley, its rate expert. On July 23 the City had sent the attorney for the District a copy of the letter. The transmittal letter informed the District that on July 24 the City would file Mr. Owsley's letter with the Examiner and would make no further presentation but would rest. The transmittal letter confirmed a telephone conversation between counsel for the City and the District. It also stated Mr. Owsley would be available for cross-examination and the District could introduce any evidence it wished. The District did not cross-examine Mr. Owsley or introduce any evidence bearing on the value of its property or concerning what it considered would be reasonable rates. It continued to challenge the City's jurisdiction.

The letter of Mr. Owsley was dated July 23, 1959, and was addressed to the Mayor and City Council via the Examiner. It is lengthy and we will not quote it, but will summarize its material contents. It noted that the District served some 3200 consumers in the City. The letter gives an extensive review of the City's efforts to obtain from the District the books, etc. for examination by the City. It points out the refusal of the District to furnish desired information. It overlooks the fact that the District had furnished the information we have above noted. Too, the letter notes that at the hearing on July 13, the attorneys for the District appeared and refused to put on evidence and refused to produce the witness or make available its books and records that had been subpoenaed. Then follows these two concluding paragraphs:

"Since Water District No. 58 is an agency engaged in the distribution and sale of water within the city limits of Houston, we see no reason why it should attempt to discriminate against approximately 3200 Houston families by charging a higher water rate than the City of Houston charges. We therefore recommend that the City Council fix the City of Houston water rates, including bimonthly billing to be the rates to be charged by Harris County Water Control and Improvement District No. 58 to its customers within the City of Houston.

"It should be understood that, if the City of Houston water rates are not adequate for Harris County Water Control and Improvement District No. 58, then it is encumbent upon said District to come forward in this hearing with competent and adequate proof from its books and records to establish to what extent, if any, such City of Houston rates would be inadequate."

The District objected to the introduction of the letter basically because it was a pure conclusion of Mr. Owsley, was not supported by any substantive evidence and the recommendation was made without any investigation.

Other than some instruments dealing with the question as to whether the property in fact was owned by the Lone Star Water Company or the District, the above matters constitute all the material evidence before the Examiner.

On August 21, 1959 the Examiner made his report and recommendation to the City Council. The entire transcript of the proceedings before him was transmitted. It recited the District had consistently challenged the jurisdiction of the City and had declined to put on any evidence or permit the City to examine its records. It then called attention to Mr. Owsley's recommendation. The report concluded with this sentence:

"Since there was no evidence offered on which any different conclusion could be based, I concur in the recommendation of the Public Service Department and suggest that the City Council adopt a motion requesting the Legal Department to prepare a rate ordinance fixing the rates in accordance with such recommendation."

Such a motion was made and passed by City Council on August 27, 1959. An ordinance was passed and became effective September 1, 1959. The ordinance recited the procedure that had been followed, as we have above stated; recited the failure and refusal by the District to produce or allow examination of its books and records; recited the failure of the District to put on evidence; recited that the recommendation of Mr. Owsley was in evidence; and recited the City Council had considered the transcript of the hearing before the Examiner and the recommendations of the Examiner and Mr. Owsley. The ordinance then enacted the City of Houston rates. It then recited if the District was not satisfied with the rates, it could apply for a hearing and one would be granted.

We have reached the conclusion that the City had jurisdiction to prescribe the rates to be charged the District's customers whom it served with water in the City of Houston, the customers being within an area wholly outside of and in no way connected with the territorial limits of the District and the customers being served through a system wholly unrelated to a system established and maintained by the District within its limits where it developed the water resources of the District, or constructed elsewhere for the purpose of primarily serving the needs within the limits of the District.

The District's position is that it is a governmental agency, a political subdivision of the State of Texas, carrying on a governmental function, that is, the conservation and development of the State's water resources. It contends it is given authority by law to distribute water within or without the District and to construct and operate distribution systems within or without its limits and that its Board of Directors is given authority to fix the rates it shall charge. It further contends that even if under the facts of this case it has exceeded its authority, its acts are not contrary to any statute nor against public policy or malum in se and only the State through quo warranto can question its acts.

It is undoubtedly true that the people of Texas through the adoption of Article 16, Section 59, of the Constitution, intended to grant the State broad powers to take steps to conserve our natural resources such as water through utilization of such resources. Too, the legislature of Texas, pursuant to the authority there conferred, has passed, among other statutes, Articles 7880-1 to 7880-147z, which authorize the creation of political subdivisions of the State to further the conservation and development of our natural resources. The agencies thus created are political subdivisions of the State and certainly while acting within the authority conferred are carrying on governmental functions. Willacy County Water Control and Improvement District No. 1 v. Abendroth, 142 Tex. 320, 177 S.W. 2d 936; Bennett v. Brown County Water Improvement District, 153 Tex. 599, 272 S.W.2d 498. However, such agencies have only such powers as are granted by statute, which include such implied powers as are necessarily implied as an incident to the express powers given. Tri-City Fresh Water Supply District No. 2 of Harris County v. Mann, 135 Tex. 280, 142 S.W.2d 945.

Article 7880-48, relied on by the District, provides in substance that the District shall have full power to construct all plants, works and improvements necessary to the purpose for which it is organized and incident thereto. It also provides the District may construct works and improvements for the purpose of supplying water for municipal uses, domestic use, power and commercial purposes and all other beneficial uses. Section 125 of the same article, in dealing with the right of eminent domain, authorizes the acquisition of land for construction of plants for purposes for which the District was formed. Such land may be either within or without the District. It also authorizes the District to contract for the use of its waters, power or other facilities or service within or without the District. Section 106 of said article gives the Board of Directors the right to fix rates to be charged by the District. So does Sec. 3a.

We are of the view, however, that the statutes do not authorize the District to roam at large throughout the State and distribute water wherever it wishes without regard to limitations placed on it by statute. We are of the view that considering all of the provisions of Article 7880, V.A.T.S., there are some limitations imposed.

Article 7880, Sec. 4, in effect contemplates and provides for geographical limits. It provides a district may include the area of any county or counties or a part thereof including towns, villages and municipal corporations. Further the lands in a district need not be contiguous but if they are not,

each segregated area must cast a majority vote before it may be included in the district. Section 10 provides that a majority in number of owners of title to the land and of the value of the land to be included in a district must sign the petition for a district. Section 11 requires that the petition designate the boundaries of the district. Sections 75, 75a, 75b and 75c all deal with addition of land to a district by making such land a part of the district. Section 138 authorizes the sale of surplus waters to others, but it is expressly stated it is the duty of the district to protect the lands within the district with an adequate supply of water for the purpose for which it was organized. Too, it was to protect the supply of water for municipal purposes within the district.

■ The effect of these statutory enactments, when considered as a whole, is not to authorize a water control and improvement district to do as appellant District here has done. It has acquired a water distribution system 22 miles outside its boundaries and the water distributed is from a source wholly outside its boundaries, and there is no use of such water within its boundaries. In other words, it is a completely autonomous system. We should note for the sake of accuracy that the District receives at least a $1500.00 per month operating fee. We do not think this legally material here. While appellant District stresses the authority conferred by statute to sell water inside or outside its limits and to exercise the right of eminent domain within or without its limits, we do not feel such authorizes the situation we have before us.

■ The statutes envision an orderly development of the State's natural resources, such as water which is here involved, through the formation of definite districts with geographical boundaries where waters of the State will be conserved through primary utilization within the district. These waters may come from within the district or from without. However, the overriding purpose is service within the district. There may not be sufficient supply within the district so the statutes have authorized acquisition of properties outside the district but, we think, to be used primarily in developing the area within the district. It is recognized, however, that the needs of the district may be served and water may be available and a district is authorized to supply water outside its limits as an incident to its primary obligation. While we recognize a plant for the accumulation or production of water may lie wholly outside of the district (Lower Nueces River Water Supply District v. Cartwright, Tex.Civ.App., 274 S.W.2d 199, ref., n. r. e., and King v. Jefferson County Water Control & Improv. Dist. No. 7, Tex. Civ.App., 281 S.W.2d 185, error ref.), the primary use of the water is to be within the district. Incident to that primary service, if the needs within the district are served, water may be furnished without the district. The same is true where the source of the water is within the district. We have no such case here. We have a case where the source of the water is wholly unconnected with the limits of the district and distribution is in an area wholly unconnected with and outside the limits of the district. This act by appellant is beyond its authority and ultra vires.

We have read all of appellants' cases and deem them distinguishable from this case on a basis of the reasoning above set out.

■ The District says even if it has no such authority, its acts are only ultra vires and the City is in no position to question its acts, but only the State of Texas may raise the question. We are of the view that when such a district without authority of law enters a municipality to carry on business, it operates as a private utility in its operations there and is subject to regulation by the municipality as any other utility. While we have found no authorities covering this precise situation there are cases that by way of dictum, which we consider sound, establish such principle. City of New Braunfels v. City of San Antonio,

Tex.Civ.App., 212 S.W.2d 817, ref., n. r. e.; Bay City Plumbing & Heating Company v. Lind et al., 235 Mich. 455, 209 N.W. 579; Borough of Verona v. Township of Cedar Grove, 49 N.J.Super. 293, 139 A.2d 584; Mettet v. City of Yankton et al., 71 S.D. 435, 25 N.W.2d 460; State of Georgia v. City of Chattanooga, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796. In the case before us the City preempted the territory here involved when it passed the annexation ordinance on first reading in February, 1956. The District did not acquire the system until December, 1956. The City is not attempting to make the District cease its operation; it is merely asserting its governmental authority to regulate, for the benefit of its citizens, the rates that the District may charge. We emphasize that such power is asserted in a situation where the District is operating where under the circumstances it is not by law authorized to operate.

We are of the view, however, that the action of the City Council was arbitrary because it was based on absolutely no investigation of the facts with regard to the fair value of the District's property and what rates as applied to that value would enable the District to realize a reasonable return on its investment. Procedural due process has been denied.

■ The City takes the position that the District must show that the rates fixed are in fact confiscatory. It says the courts are concerned only with the end result. This position is correct where procedural due process has been observed. Railroad Commission v. Houston Natural Gas Co., 155 Tex. 502, 289 S.W.2d 559. All of the cases cited by the City to sustain its position were cases where procedural due process had been observed by notice and a hearing at which the regulatory body had gone forward and introduced substantial substantive evidence as to value and had on the basis of such exercised its legislative judgment. In such cases it was correctly held that presumptively the rates fixed were valid and the utility was under the burden of proving

the rates confiscatory. None of them were cases where the regulatory body had reduced rates without a consideration of substantive evidence as to the value of the utility's property and an exercise of legislative judgment based on such evidence.

■ We have heretofore held that procedural due process must be observed and that procedural due process requires notice and hearing. City of Houston v. Willow Bend Utilities, Inc. et al., Tex.Civ.App., 331 S.W.2d 333, ref., n. r. e. Supporting our holding are cases there cited. Subsequent to our decision the Supreme Court of Texas held the same. Glen Oaks Utilities, Inc. v. City of Houston, Tex., 340 S.W.2d 783. It is true that in the case decided by us the ordinance reducing rates was enacted without any notice and in the Glen Oaks case the ordinance was enacted without notice after a suspended and uncompleted hearing. We deem this to be no significant difference from the case before us. In those cases no requirement was made that the utility establish the rates fixed were in fact confiscatory.

■ A utility, in the absence of assertion by a regulatory body of its authority to fix rates, may fix its own rates. United Gas Corp. v. Shepherd Laundries, 144 Tex. 164, 189 S.W.2d 485; City of Houston v. Memorial Bend Utility Co., Tex.Civ.App., 331 S.W.2d 418, ref., n. r. e. In this case the District had fixed its rates at a time before the City assumed to reduce them. When the City moved to assert its rate making authority by giving notice to the District to show cause why its rates should not be reduced the burden was on the City to introduce evidence as to value of the property, income, expense, etc., so the Council would have some material evidence on which it could exercise legislative judgment. While no Texas case has been cited, and we have found none, holding expressly that the burden of going forward is on the regulatory body, we hold such to be law on principle. A legally established rate, such as the District had established here, **is**

binding until set aside. It may not be invalidated by legislative fiat. It can only be set aside by the party attacking it showing factually that it is excessive and other rates are sufficient. Eldridge v. Fort Worth Transit, Tex.Civ.App., 136 S.W.2d 955, dism., cor. judg.; In re Coal Rate in New Mexico, 23 N.M. 704, 171 P. 506. We think it very significant that while the many cases cited us and which we have ourselves found that deal with efforts of a regulatory body to reduce rates, the regulatory body has gone forward with the introduction of substantive evidence and has exercised legislative judgment on the basis of substantive evidence before it.

■ The rate ordinance passed in this case was passed without according the District procedural due process because it was based on no substantive evidence. The Council merely by legislative fiat fixed the rates. The ordinance on its face shows the rates were fixed on a basis of the recommendation of the utility rate expert and the Examiner. The recommendations of the rate expert and the Examiner were made on a basis of their thought that, since the District was serving customers in the City and the District not having offered any evidence as to why the District should charge a different rate, they saw no reason why the water rates charged by the City of Houston should not be fixed for the District. The fact that the City charges certain rates is of no probative value in determining what rates the District should charge in the absence of a showing of comparable systems. Texas & New Orleans R. R. Co. v. Railroad Commission, 155 Tex. 323, 286 S.W.2d 112. We judicially know that the City has many thousands of customers while the record here shows the District has some 3200 customers. This one item of difference will itself illustrate the obvious want of comparability.

Also, the ordinance was based on the fact that the District refused to produce its books and records that were subpoenaed. Mr. Owsley's letter, which was introduced before the Examiner, shows his recommendation was made as to rates, not on a basis of an examination of information previously furnished by the District, and his expert estimation on matters such as operating expenses which the District had not furnished, but because the District refused to produce their books, and he saw no reason why the District should charge any different rates than the City. The recommendation of the Examiner and the ordinance of Council have no different foundation.

■ The City says the District cannot complain because it refused to produce its books after they were subpoenaed. The failure to respond to a subpoena is not punishable by the fixing of rates in a manner which denies due process. The subpoena can be enforced by court action. Too, the City overlooks the fact that the District had furnished the information we have above outlined, but the City seems to have made no use of it.

The City contends the District did not plead denial of procedural due process. We have read the entire pleading, including the trial amendments, and are of the view they are sufficient to raise the issue.

We, therefore, hold the rate ordinance is void and we here render judgment dissolving the injunction granted by the trial court enjoining the District from charging rates in excess of those fixed by the City in its ordinance. However, we hold that the City does have jurisdiction under the facts of this case to fix the rates to be charged by the District for water served its customers in the City.

Reversed and rendered.

COLEMAN, J., not sitting.