**CITY OF SAN ANTONIO et al., Appellants,**

**v.**

**TEXAS WATER COMMISSION et al., Appellees.**

No. 11275.

Court of Civil Appeals of Texas.

Austin.

June 16, 1965.

Rehearing Denied July 7, 1965.

Boyle, Wheeler, Gresham, Davis &
Gregory, A. W. Worthy, J D. Wheeler,

Robert Sawtelle, Sam S. Wolf, J. Bruce Aycock, San Antonio, for appellants.

Waggoner Carr, Atty. Gen., Hawthorne Phillips, 1st Asst. Atty. Gen., Stanton Stone, Executive Asst. Atty. Gen., J. S. Bracewell, George C. Black, F. R. Booth, Asst. Attys. Gen., Vinson, Elkins, Weems & Searls, Victor W. Bouldin, Houston, Clark, Thomas, Harris, Denius & Winters, Martin Harris, Austin, Baker, Botts, Shepherd & Coates, John S. Sellingsloh, James G. Ulmer, Edward S. Howell, Houston, for appellees.

PHILLIPS, Justice.

We withdraw our former opinion and substitute the following:

This case involves two applications to the Texas Water Commission, one, on the part of the City of San Antonio and its Water Works Board of Trustees requesting 100,000 acre feet of water from the Canyon Dam Reservoir in Comal County for municipal purposes, the other on the part of the Guadalpe-Blanco River Authority requesting water from the same source and for the same purposes. The water sought to be appropriated by San Antonio was to have been removed from the watershed of the Guadalupe River and transported by pipeline to the watershed of the San Antonio River in Bexar County, Texas.

The hearing on the two applications was consolidated by what was then the Board of Water Engineers. A hearing was begun on June 25, 1956 and continued until July 27, 1956. On July 5, 1957 the Board issued an order granting the application of Guadalupe-Blanco River Authority to the extent of 50,000 acre feet annually for municipal purposes with one commissioner dissenting. On the same day, the Board issued an order denying the application of the City of San Antonio with one dissent.

The Board of Water Engineers was changed to the Texas Water Commission in 1962. Hereinafter the Board of Water Engineers will be referred to as the Texas Water Commission or the Commission. The Guadalupe-Blanco River Authority will be referred to as the GBRA.

The City of San Antonio and its Water Works Board of Trustees then filed two appeals from the above mentioned orders of the Texas Water Commission in the District Court of Travis County, Texas, under Article 7477, Vernon's Ann.Civ.St. One appeal was from the order of the Commission denying its application, the other, from the Commission's action granting Guadalupe-Blanco the above mentioned 50,000 acre feet. The two cases were consolidated and tried together in the trial court.

The City of Seguin intervened in the case as well as Victoria, Calhoun County and the City of New Braunfels. Other intervenors were Union Carbide Corporation & E. I. DuPont de Nemours. These intervenors aligned themselves with the position taken by appellee GBRA.

The case was tried to the court without a jury and on June 19, 1964, the court rendered judgment upholding the action of the Texas Water Commission and denied San Antonio and its Water Works Board of Trustees any relief. The court also upheld the permit granted GBRA for 50,000 acre feet of water annually for municipal purposes. From this judgment the City and its Water Works Board have appealed to this Court.

We affirm the judgment of the trial court.

The City of San Antonio and its Water Works Board of Trustees, hereinafter referred to as appellants, is before this Court on twenty-four points of error. Inasmuch as these points were not argued and briefed in order and several were briefed and argued together in groups, we will not refer to the points by the number assigned them in appellants' brief, however, we will endeavor to meet and discuss each point that was presented.

Appellant City of San Antonio is a municipal corporation operating under a home rule charter, and the Water Works Board of Trustees of San Antonio is a department of the City which manages and controls the City's water supply system.

On March 2, 1953, appellants tendered the Commission the City of San Antonio's presentation under Article 7496, V.C.S. for the purpose of determining the feasibility of the City's participation in the cost of the construction of Canyon Dam and the right to appropriate as a supplemental supply unappropriated water of the State to be impounded in the future by the Dam. By an order dated April 2, 1953, the Commission rejected the presentation and declined to accept it for filing,[1] however, after litigation in the courts on this point, the Commission accepted the presentation for filing on April 5, 1953 with certain reservations not pertinent here.

On September 9, 1954, appellants under the provisions of Art. 7496, filed an application for an extension of time to continue certain studies in process under said presentation, which extension was granted by the Board on September 13, 1954.

During this time appellants entered into a study of the various sources of water available to the City and in this regard spent a total of $239,272.74 for engineering studies. Pursuant to this study the San Antonio City Council reached the conclusion in 1955 that Canyon Dam was a source which could be developed economically and was the most feasible source to the City.

At the trial of this case, appellants complained of the Commission's denial of their permit for the 100,000 acre feet of water requested and also of the Commission's action in granting GBRA authority to take 50,000 acre feet of water from the Dam. In support of the former complaint, appellants argued that: (1) their application for a permit was in proper form and accompanied by the required fees; (2) the use of the water applied for was one authorized by statute; (3) the application was prior in time to that of GBRA, and (4) appellants had the financial ability to complete the project. Appellants also complain of the permit issued to GBRA and contend that the Commission is without authority to grant it.

At this point of the trial appellants rested and made a motion for judgment alleging that there were no fact issues in dispute, only matters of law. This motion was overruled by the court, however at this same point in the trial, the Attorney General acting on behalf of the Commission and its individual members made a motion for summary judgment urging the fact that the case was to be tried under the substantial evidence rule, that the appellants had failed as a matter of law to present any evidence tending to show that the Commission's order was unreasonable and not supported by substantial evidence and had wholly failed to overcome the presumption of the validity of the orders. The court agreed to carry the Attorney General's motion along with the trial, however, at the conclusion of the trial he overruled this motion. After the court stated that it would carry the Attorney General's motion with the case, the Attorney General announced that the Commission did not desire to introduce evidence and rested. The Attorney General has a cross assignment of error before us complaining of the trial court's action in overruling his motion for summary judgment, however, in view of our disposition of this case, we need not pass on this point.

---

1. The Commission stated in its order of April 2 that while all formalities of the presentation were in order, Art. 1434a V.A.C.S., specifically forbade withdrawal of water from the Guadalupe watershed and for this reason the Board declined to accept the presentation for filing.

San Antonio brought suit attacking the constitutionality of Art. 1434a, which contention was upheld by the trial court, the Court of Civil Appeals, Board of Water Engineers of State v. City of San Antonio, 273 S.W.2d 913 and the Supreme Court, 155 Tex. 111, 283 S.W.2d 722.

Appellee, GBRA, while agreeing that the Attorney General's motion for summary judgment was a valid one, went ahead with the trial and presented extensive evidence in support of the Commission's orders respecting each of the permits in question.

As we understand appellants' position in this case, the Commission had no choice, irrespective of other considerations, except to grant San Antonio a permit for the exact annual quantity of water that was granted to GBRA and to deny GBRA's application. In support of this position appellants rely heavily on Board of Water Engineers v. Briscoe, Tex.Civ.App., 35 S.W.2d 804 (1930, error dismissed). Appellants contend that this case holds that a person who files a presentation first is entitled to a permit as a matter of law if there is unappropriated water in the stream in question. Appellants then cite Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, for the proposition that the Commission is to find unappropriated water by adding up the amount of water previously appropriated as shown on their records and subtracting it from the amount of State water which they had previously determined the stream furnished. From here appellants contend that since the Commission allotted the GBRA 50,000 acre feet of water there was substantial evidence before the trial court (presented by GBRA) showing this amount to be unappropriated and available, therefore San Antonio is entitled to this amount. That any discretion that the Commission might have is limited by law to two considerations: (a) Is the presentation, and later the application for appropriation for approved purposes; (b) Is there unappropriated water in the source of supply.

There is no doubt but that appellants were first to file their presentation and later their application; that this presentation was for an approved purpose and that GBRA had in fact never filed a presentation before presenting their application. Appellants for all practical purposes complied with the provisions of Art. 7507, V.C.S., hereinafter set out. We cannot agree however that the 50,000 acre feet of water granted to GBRA is unappropriated water as readily available to San Antonio, which is not in the Guadalupe watershed, as it is available to users within the Guadalupe watershed. This point and the evidence pertinent thereto will be discussed further later in this opinion. Appellants place great stress on the argument that their presentation and application for appropriation contemplate the use of water for an approved purpose under Articles 7470 and 7471 and the fact that the Commission has accepted the presentation as to this extent and purpose. That they have a primary right under Art. 7471 as a city to appropriate the water.[2] Nor can we agree with appellants' position that under the aegis of the Briscoe case to the effect that since their presentation was filed first and since there is unappropriated water, they are entitled to a permit as a matter of law. The matter in controversy in Briscoe as stated by the court therein was: " * * * in other words, the two opposing sets of individuals were the real parties at interest, and the substantive bone of contention or issue over which they were at loggerheads was which of them was entitled to the preferential right to such use of the water." Neither the public interest nor the conflicting interests of rival cities or municipalities were involved. While

2. Article 7470 in substance is as follows: Appropriation of Water.
 "The public waters of this state may be appropriated for any of the following purposes:
 Irrigation, mining, milling, manufacturing, development of power, the construction and operation of waterworks for cities and towns, for stockraising, public parks, game preserves, recreation and pleasure resorts, power and water supply for industrial purposes and plants and for domestic use. * * * subject to the priority of appropriations as set forth in Article 7471. As amended Acts 1957, 55th Leg., p. 254, Ch. 118."
 Article 7471 is set out in full later in this opinion.

the court did use language to the effect that Briscoe was entitled to the permit as a matter of law leaving only a ministerial duty to be performed by the Board in granting the permit, this case was decided in 1930. Since this date we have certain amendments passed in 1931 to the main body of the water laws known as the Wagstaff Act, hereinafter discussed, and the decision of the Supreme Court in Southern Canal Co. v. State Board of Water Engineers, 159 Tex. 227, 318 S.W.2d 619. Also, under the fact situation at bar, we are confronted with the prohibition stated in Art. 7589, V.C.S., which makes it unlawful to divert water from one watershed to another watershed to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted. In Briscoe there was only one watershed involved.

In order to determine whether the Commission's discretion is limited to the "mathematical function" of finding whether there is unappropriated water in the source of supply, as appellants contend, it is necessary to review the statutes found in Chapter 1, Title 128, V.T.C.S., declaring the State's water policy and prescribing the duties and functions of the Commission. The first of these is Article 7466 which is copied from Section 59 of Article XVI of the Texas Constitution (the Conservation Amendment), Vernon's Ann.St. and which declares that the conservation and development of the State's water resources are public rights and duties.

Article 7467 provides that all of the waters of every river and natural stream in the State are the property of the State and the right to the use thereof may be acquired only by appropriation in the manner and for the uses and purposes set forth in said Chapter 1.

Article 7492 provides that anyone desiring to acquire the right to appropriate unappropriated water of the State shall make an application in writing to the Commission

for a permit and Article 7493 prescribes the contents of such an application.

Article 7503 provides that "[u]pon the filing of such application, accompanied by the data and fees hereinbefore provided, it shall be the duty of the Board to make a preliminary examination thereof and, if it appear that there is no unappropriated water in the source of supply, or that, for other reasons, the proposed appropriation shall not be allowed, the Board may thereupon reject such application; * * *."

Articles 7509 and 7510 require public notice and a public hearing on each such application and authorize any person, associations of persons, corporation, or irrigation district to appear, in person or by attorney, and to enter appearance in writing and present objections to the issuance of the permit, and the Board is authorized to receive evidence, orally or by affidavit, in support of or in opposition to the issuance of such permit and may also hear arguments. Article 7510 specifically further provides as follows:

"* * * It shall have power to adjourn such hearing from time to time and from place to place, and after full hearing to render decision in writing approving or rejecting such application. Such application may be approved or rejected in whole or in part. Nothing herein contained shall prevent the Board from rejecting any application in whole without the issuance of the notice herein required."

Article 7506 reads as follows:

"It shall be the duty of the Board to reject all applications and refuse to issue the permit asked for if there is no unappropriated water in the source of supply; or if the proposed use will impair existing water rights, or is detrimental to the public welfare."

Article 7507 reads as follows:

"It shall be the duty of the Board to approve all applications and issue the

permit asked for if such application is made in proper form in compliance with the provisions of this chapter and the regulations of said Board; and is accompanied by the fees required in this chapter; and if the proposed appropriation contemplates the application of water to any of the uses and purposes provided for in this chapter, and does not impair existing water rights, or vested riparian rights and is not detrimental to the public welfare."

Article 7471 provides that in the event the Commission considers two applications at the same time for water from the same source, preference and priority shall be given to the following uses in the order named, to-wit: (1) domestic and municipal uses; (2) industrial and manufacturing; (3) irrigation; (4) mining and recovery of minerals; (5) hydro-electric power; (6) navigation; and (7) recreation and pleasure.

Article 7472c states with reference to the foregoing preferential uses, that " * * * recognizing the Statutory precedent established for granting the privilege to take and utilize the waters of the State for uses recognized and authorized, it shall be the duty of the State Board of Water Engineers or other agency of the State designated for the purpose to observe the rule that as between applicants for rights to use the waters of the State, preference be given not only in the order of preferential uses declared, but that preference also be given those applications the purposes for which contemplate and will effectuate the maximum utilization of waters and are designated and calculated to prevent the escape of waters without contribution to a beneficial public service."

Article 7472d requires the Commission to make surveys of the potential water resources of the State and " * * * to ascertain from necessary investigation the character of the principal requirements of the distinct regional division of the watershed areas of the State for the uses herein

authorized, to the end that distribution of the right to take and use the waters of the State may be the more equitably administered in the public interest, and privileges granted for the uses recognized may be economically coordinated, achieving the maximum of public value from this resource; and recognizing alike the distinct regional necessities for water control and conservation, and for control of harmful floods."

Article 7589 makes it unlawful to divert water from one watershed to another watershed to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted.

Article 7590 provides that before any water is diverted from one watershed to another watershed, the person desiring to make such diversion shall make application to the Commission for a permit so to take or divert such waters and no such permit shall be issued by the Commission until after full hearing as to the rights to be affected thereby and public notice of such hearing is required.

Article 7591 provides that any diversion of water from one watershed to another without compliance with the two preceding articles shall constitute a misdemeanor punishable by fine and imprisonment.

Articles 7472d–1 and 7477 place the duty upon the Commission to collect data, make investigations and prepare a report to the Legislature recommending a plan "for the maximum development of the water resources of the state" and to cooperate with other State and Federal agencies in such matters.

Article 8280–9, Sec. 12, requires that before applicants may obtain financial assistance from the State in the construction of water supply projects, the Commission must certify to the feasibility of the project, the existing need or bona fide future need within a reasonable time for the water to be provided by the project and that the ap-

plicant is possessed of the necessary permit or other right to appropriate such water.

■ The statutes found in Chapter 1, Title 128, demonstrate conclusively that the Legislature has made provision for a comprehensive system of administration of the State's water resources through the Texas Water Commission and the above discussed statutes further demonstrate that the Legislature has vested the Commission with very broad discretion in either granting or denying applications for permits. The provisions that the Commission shall reject an application if it is "detrimental to the public welfare," that the Commission may return an application if it finds that there is no unappropriated water "or that, for other reasons, the proposed appropriation shall not be allowed," that the Commission shall "after full hearing render decision in writing approving or rejecting such application" and that such application "may be approved or rejected in whole or in part," and that trans-basin diversions shall not be made to the prejudice of the losing basin, all demonstrate the intention of the Legislature to delegate discretion to the Commission which extends beyond a "mathematical calculation" of unappropriated waters. This conclusion is also inescapable from the admonitions set forth in the Wagstaff Act of 1931 that not only the order of preferential uses shall be considered but also that preference shall be given those applications which will (in the opinion of the Commission) "effectuate the maximum utilization of waters and * * * prevent the escape of water without contribution to a beneficial public service" and the further admonition to take into account, in granting applications, "the distinct regional division of the watershed areas of the State for the uses herein authorized, to the end that distribution of the rights to take and use the waters of the State may be the more equitably administered in the public interest, and privileges granted for the uses recognized may be economically co-ordinated, achieving the maximum of public value from this resource; and recognizing alike the distinct regional necessities for water control and conservation, and for control of harmful floods." These legislative directives and standards cannot be given effect unless the Commission exercises a broad discretion much greater than the role of computer or bookkeeper as suggested by appellants.

It was the policy expressed in the foregoing statutes which prompted the Supreme Court to say in Southern Canal Co. v. State Board of Water Engineers, supra:

"By the enactment of the Articles contained in Chapter I of Title 128 of our statutes the Legislature has sought, in a comprehensive way, to regulate the use of waters from our rivers, streams and lakes to the end that they will be conserved and used for the greatest public good and in the public interest. To make certain that such waters are so conserved and used the Legislature has created The State Board of Water Engineers and has entrusted to it broad discretion, within certain statutory limits, in determining whether an application for a permit to appropriate and divert such waters to a particular use shall be granted or denied."

The statutory limits are set forth in the above mentioned statutes and they extend far beyond the duty merely to inventory unappropriated water.

This Court, in Clark v. Briscoe Irr. Co., Tex.Civ.App., 200 S.W.2d 674 (1947 n. w. h.) also reviewed many of the statutes found in Chapter I, of Title 128 and said (Page 682):

"These statutory provisions clearly invest the Board with the power and duty to determine whether the uses for which the application is made meets the statutory objectives, including that of being in the public interest. Necessarily the determination of that issue involves the exercise of a sound and reasonable discretion. Nor is it contended

that the Board has not such discretion in passing upon an original application."

The presentation procedure is ex parte and preliminary and is no substitute for the public notice and hearing as to permit applications by Articles 7492, 7508, 7509 and 7510.[3]

Referring again to Article 7589 making it unlawful to divert water from one watershed to another "to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted" would certainly raise a very important question of public policy where rival cities in separate and distinct watersheds are applying for the same water.

In Southern Canal the Supreme Court stated that the reasonableness of an order of the Commission is to be tested by a trial in the district court under the substantial evidence rule, citing Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W. 2d 181, 27 A.L.R.2d 965. In Board of Firemen's Relief the Court stated that the question of the reasonableness of the order of an administrative agency must be determined by the courts from a consideration of the entire record in the case as that record has been made in the trial court.

Appellants offered no evidence as to the hydrology of the Guadalupe River, whether or not there are any unappropriated water in the Guadalupe River, whether San Antonio's proposed use and diversion of water will impair existing water rights or is detrimental to the public welfare, or whether or not San Antonio has need for an additional water supply. (With regard to this need for water, before the close of trial appellants introduced a report of the Com-

3. Article 7492 is summarized in this opinion. Arts. 7508, 7509, 7510 are as follows:
"Art. 7508. Conditions of application
Before the Board shall approve any such application and issue any such permit, notice of such application shall be given substantially in the following manner:
Such notice shall be in writing; shall state the name of the applicant and his residence; the date of the filing of the application in the office of the Board; the purpose and extent of the proposed appropriation of water; the source of supply; the place at which the water is to be stored, or to be taken or diverted from the source of supply; together with such additional information as the board may deem necessary. If the proposed use is for irrigation, such notice shall contain a general description of the location and the area of the land to be irrigated. Such notice shall also state the time and place when and where such application will be heard by the Board. Id. sec. 25.
Art. 7509. Publication of
Such notice shall be published once in each week for four consecutive weeks prior to the date stated in such notice for the hearing of such application in some newspaper having a general circulation in that section of the State in which the source of water is located.

In addition to such publication, a copy of such notice shall be transmitted by the secretary of the Board, by registered mail, addressed to each claimant or appropriator of water from such source of water supply, the record of whose claim or appropriation has been filed in the office of the Board. Such notice shall be mailed not less than twenty days before the date set for the hearing.
Art. 7510. Hearing of application
At the time and place stated in the notice, the Board shall sit to hear such application. Any person, association of persons, corporation, or irrigation district may appear, in person or by attorney, and enter appearance in writing in said matter and present objection to the issuance of permit. The Board may receive evidence, orally or by affidavit, in support of or in opposition to the issuance of such permit; and may also hear arguments. It shall have power to adjourn such hearing from time to time and from place to place, and after full hearing to render decision in writing approving or rejecting such application. Such application may be approved or rejected in whole or in part. Nothing herein contained shall prevent the Board from rejecting any application in whole without the issuance of the notice herein required. Id. p. 218, sec. 27."

mission to the Governor stating that the City of San Antonio would need to import 138,000 acre feet of water from other basins by the year 1980. This report, the introduction of which was objected to by appellees, was prepared some four years after the hearing in question was held before the Commission.)

Further, appellants offered no evidence as to whether the resources of the San Antonio River, in which basin San Antonio is located, have been reasonably developed so as to justify San Antonio importing water from another watershed; whether or not the diversion of water from the Guadalupe watershed into the San Antonio River watershed would be of prejudice to persons or property within the Guadalupe watershed; whether or not San Antonio had, or could obtain consent to use Canyon Reservoir for the storage of water, or any of the other numerous factors which bear upon the exercise by the Commission of the discretion vested in it by law in granting or refusing applications for the appropriation of public waters.

As we have stated above, the GBRA presented extensive evidence pursuant to which the trial court made certain findings of fact and conclusions of law.

The trial court found that the appellants offered no evidence of any character showing or tending to show that the two orders issued by the Texas Water Commission were unreasonable or were not supported by substantial evidence or that the Commission was arbitrary or capricious in making and entering said orders.

Appellants attack this finding and contend that they have satisfied the requirements of the substantial evidence rule by showing in the trial court "either by undisputed evidence, or by findings of the Board, that are supported by substantial evidence" and evidence "submitted by other parties hereto." Then appellants cite the rule stated by the Supreme Court in Gibraltar Savings & Loan Association v. Falkner, 371 S.W.2d 548:

" * * * the burden is on the one appealing from the Commissioner's order to show that the order appealed from is not reasonably supported by substantial evidence, existing at the time of the entry of the order by the Commissioner. This showing must be made at the trial court hearing. This may be done by a showing that all of the evidence available to the Commissioner and given in the trial court on appeal, so conclusively demands an affirmative finding on all requirements that a negative finding on any requirement can have no support in substantial evidence; therefore negative findings are arbitrary."

Appellants maintain that substantial evidence showing the unreasonableness of the order can be found from the testimony of the parties defending the order, in this case the appellees, and then present excerpts from this testimony to prove their case.

We do not deem it necessary to pass on the question of whether or not evidence given by one seeking to uphold an administrative order can by itself alone, and with no other evidence in the case, inure to the benefit of one seeking to invalidate the order and satisfy the burden placed on the party appealing from the order.

Under the above quoted mandate by the Supreme Court in Gibraltar and, further, by that of Southern Canal, we must hold that the GBRA presented substantial evidence at the trial of this case to uphold the order and to hold otherwise would be to substitute our judgment for that of the Commission.

In its findings of fact the trial court found that the City of San Antonio has an ample water supply for its present uses and has no need for an additional water supply for at least 15 to 20 years from time of trial. That the cities along the Guadalupe River do not have an ample water supply and there is a present and immediate need for reservoir storage on the Guadalupe River to firm up a water supply for use

within the watershed. That the dependability of the natural flow of the Guadalupe River which has historically been supplied by the Comal Springs and other springs fed from the Edwards Limestone Formation, has been destroyed because of increase pumping of water from the Edwards Limestone Formation particularly in San Antonio and Bexar County and the natural flow of the river from said springs can no longer be depended upon for a secure water supply. That foreseeable needs for water within the Guadalupe River watershed exceed the total amount of water which can be supplied when the river has been fully developed and the Guadalupe is not a basin of surplus supply for planning purposes.

From our review of the record of this case we cannot state that these findings are not supported by substantial evidence, especially in view of the fact that there is little or no evidence to contradict them.

The trial court further found that the diversion of 100,000 acre feet of water per annum from Canyon Reservoir out of the Guadalupe River watershed and into the watershed of the San Antonio River would impair and destroy the vested water rights of the following existing prior appropriators from the Guadalupe River, to wit: the cities of Seguin and Gonzales, Guadalupe-Blanco River Authority, Central Power and Light Company, a public utility corporation, E. I. Du Pont de Nemours, Westside Calhoun County Navigation District, and Union Carbide Corporation.

In regard to this last finding, appellants contend that the issue is not 100,000 feet but the 50,000 feet which the Commission has apparently found available as unappropriated water and assigned to GBRA for municipal purposes. We overrule this contention as there is ample evidence in the record that water unappropriated and available for inshed users is not the same as that available for use without the watershed. This is apparently so from the fact that the same water can be used repeatedly for different purposes, which purposes are in addition to those for municipal purposes of consumption for humans and animals.

There is evidence that during the great drought of the middle fifties the City of Seguin, which is entirely dependent on the Guadalupe River for domestic and municipal waters, was without water during that period. This was with the exception of a small amount impounded in a nearby pool of Texas Power Corporation. The City of Seguin hydroelectric plant was shut down entirely for lack of water for a long period of time during this drought and the City was compelled to purchase electricity from other sources. A health hazard was created by a lack of good quality water to dilute the inflow of sewage effluent into the small hydroelectric pool from which the City drew its municipal water during this time.

The court further found that the diversion of water from Canyon Reservoir and the watershed of the Guadalupe River into the City of San Antonio and the watershed of the San Antonio River would be of prejudice to persons and property situated within the Guadalupe River watershed.

The court further found that if the above-mentioned vested water rights are not impaired, Canyon Reservoir, irrespective of leakage, would not be a dependable water supply for the City of San Antonio but in a repetition of drought conditions which occurred in the period 1951 to 1957, the diversion of water to San Antonio at the rate of 100,000 acre feet per annum so long as water is available in said reservoir, would dry up said reservoir and San Antonio could divert no water therefrom for a continuous period of more than four years.

The record shows that very substantial water rights are owned by prior appropriators on the Guadalupe River below Canyon Dam. Some of these rights have been in existence for more than 50 years. The following is a list of some of the major appropriations, including both permits and certified filings, taken from the records of the Texas Water Commission and presented at the trial as Exhibits of GBRA:

| NAME | PERMIT OR C.F. NUMBER | QUANTITY (Acre Feet/Year Or C.F.S.) | PURPOSE |
|---|---|---|---|
| City of Seguin | C.F. 802 | 415 C.F.S. | Power |
| City of Seguin | C.F. 803 | 415 C.F.S. | Mun. & Power |
| City of Cuero | C.F. 529 | – – | Municipal |
| City of Gonzales | C.F. 570 | 1,095 A.F. | Municipal |
| City of New Braunfels | C.F. 411 | 1,460 A.F. | Municipal |
| City of Victoria | Permit 1741 | 11,200 A.F. | Municipal |

### PUBLIC AGENCIES

| | | | |
|---|---|---|---|
| GBRA (Tex. Power Corp.) | Permit 21 | 1,300 C.F.S. | Power |
| GBRA (Tex. Hydro Electric Corp.) | Permit 1096 | 1,380 C.F.S. | Power |
| Westside Calhoun County | Permit 1614 | 126,000 A.F. | Mun., Ind. & Irr. |
| | Permit 1375 | 42,615 A.F. | Ind. & Irr. |
| | Permit 1592 | 9,944 A.F. | Mun., Ind. & Irr. |
| Navigation District & Union Carbide Corp. | Permit 1564 | 940 A.F. | Ind. & Irr. |
| | Permit 1319 | 2,500 A.F. | Ind. & Irr. |
| | Permit 1362 | 1,870 A.F. | Ind. & Irr. |

### PRIVATE CORPORATIONS

| | | | |
|---|---|---|---|
| E. I. du Pont de Nemours | Permit 1472 | 198,000 A.F. | Industrial |
| Central Power & Light Co. | Permit 1594 | 209,189 A.F. | Industrial |
| Central Power & Light Co. | C.F. 571 | (1500 H.P.) | Power |
| Mission Valley Mills, Inc. | Permit 1887 | 2,413 A.F. | Industrial |
| Mission Valley Mills, Inc. | Permit 590 | 400 C.F.S. | Power |

In this regard, the court found that the water stored in Canyon Reservoir can be used within the watershed of the Guadalupe River approximately 20 times by successive appropriators downstream before such water is discharged to the Gulf of Mexico and the retention of such water within the watershed will effectuate the maximum utilization of such waters and will achieve the maximum of public value from this resource.

A further finding was to the effect that the Canyon Dam and Reservoir are situated in the Balcones Fault Zone which is noted for its underground faults and caverns and for its porous limestone which may cause substantial leakage of water from the reservoir when complete, thereby making said reservoir useful only for flood control purposes. That until the Canyon Dam has been completed, the reservoir has been filled and leakage in the reservoir has been test-

ed, the ability of the reservoir to hold water and provide a dependable municipal water supply is uncertain.

The court's last finding of fact was that the City of San Antonio has made no effort to develop a supplemental surface water supply from the San Antonio River in which said City is situated and considerably more than 100,000 acre feet of water per annum can be developed from said river on a dependable basis, without danger of leakage, by the construction of one or more dams and reservoir projects. That it is the general policy of the Texas Water Commission to require reasonable development of local surface water resources before authorizing the diversion of water from another stream or watershed.

█ We hold that there was substantial evidence to uphold the Commission's order denying appellants the permit they sought.

In addition to appellants' contention that they are entitled to the benefit of any "substantial evidence" introduced by the appellees herein, they point to the abovementioned Report of the Commission to the Governor, wherein it is stated that by 1980 San Antonio will need an additional water supply from sources outside its own watershed. In addition, they cite an ordinance of their city government dated December 8, 1955, which recites that it has been established that the water from the Edwards Formation Reservoir for the use of the City of San Antonio is limited as to available supply, that such supply is subject to a continuing decrease and further that by studies conducted by competent authorities of the possibility of developing additional sources of supply from both around and surface waters in the territory contiguous to San Antonio discloses that no further source can be developed to provide water in adequate amount and in good quality at a reasonable cost of production. A copy of this ordinance was introduced in evidence. No further evidence was presented in this regard by appellants and no witnesses testi-

fied as to any of the recitations set out in the ordinance.

The evidentiary value of the abovementioned report to the Governor issued some four years after the hearing in question and the abovementioned ordinance is tenuous at best. If, for purposes of argument, we waive the apparent ullage here, we have, at best, some evidence which in this case is certainly not substantial evidence. See Gerst v. American Savings and Loan Ass'n, Tex.Civ.App., 384 S.W.2d 352, writ ref., n. r. e.

In its conclusions of law, the Court found that:

"5. Guadalupe-Blanco River Authority is charged by law with the duty to control, store, preserve and distribute within its boundaries the public waters of the Guadalupe River not otherwise appropriated, subject to the continuing supervision and direction of the Texas Water Commission, and is a proper agency to develop a water supply in Canyon Reservoir for all cities situated within its boundaries which desire to use water from such reservoir."

And further:

"Permit No. 1886 issued by the Texas Water Commission to Guadalupe-Blanco River Authority under date of January 22, 1959 is supported by substantial evidence, is reasonable and in all things valid and is now in full force and effect according to its terms."

Permit No. 1886 granting the GBRA water "for municipal purposes" contains the following condition:

"The permitee is authorized to use the bed and banks of the Guadalupe River to convey the water from the proposed reservoir to the pumping plants of the municipalities with which said permitee has contracted to supply said municipal water. It is specifically provided that no releases of water under the terms of this permit shall be made to any municipality until a

copy of the executed contract between said municipality and the permitee has been filed with and approved by the Board of Water Engineers, and this applies to assignees and agents of municipalities."

■ Appellant assigns error to this conclusion of the Court contending that the Commission does not have the authority to delegate the right to the GBRA to furnish water for municipal purposes to the cities along its rivershed. We overrule this contention.

The GBRA is a creature of Sec. 59, Art. XVI [4] of the Texas Constitution (the Conservation Amendment) and Art. 8280–106, V.A.T.S., hereinafter referred to as the GBRA Act.

Section 1 of the GBRA Act is as follows:

"Section 1. * * * Such District shall be and is hereby declared to be a governmental agency and body politic and corporate, with the rights, privileges, and functions hereinafter specified, and the creation of such District is hereby determined to be essential to the accomplishment of the purposes of Section 59 of Article 16 of the Constitution of the State of Texas, including (to the extent hereinafter authorized) the control, storing, preservation and distribution of the waters of the Guadalupe and Blanco Rivers and their tributaries for irrigation, power, and other useful purposes, the reclamation and irrigation of arid, semi-arid and other lands needing irrigation, and the conservation and development of the forests, water and hydro-electric power of the State of Texas."

Section 2 and 2(a) are as follows:

"Sec. 2. Except as expressly limited by this Act, the District shall have and is hereby authorized to exercise all powers, rights, privileges, and functions conferred by General Law upon any District or Districts created pursuant to Section 59, of Article 16, of the Constitution of the State of Texas. Without limitation of the generality of the foregoing, the District shall have and is hereby authorized to exercise the following powers, rights, privileges, and functions;

(a) to *control, store and preserve*, within the boundaries of the District, the waters of the Guadalupe and Blanco Rivers and their tributaries for *any useful purpose*, and to use, *distribute and sell* the same, within the boundaries of the District, for *any such purpose*." (Emphasis added.)

In Section 2(a) the GBRA is authorized to "control, store and preserve" and to

4. Art. XVI, Sec. 59(a) of the Texas Constitution is as follows:

"The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its overflowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law."

"distribute and sell" the waters of the Guadalupe and Blanco Rivers "for *any* useful purpose." *Any* useful purpose is as comprehensive as the legislature could make it. "In construing statutes, the word 'any' is equivalent to and has the force of 'every' or 'all.'" Doherty v. King, Tex.Civ.App., 183 S.W.2d 1004, error dism.

It will be noted that in Section 2 of the GBRA Act set out above there is a general grant of power to the GBRA to exercise all powers, rights, privileges, and functions conferred by the general law upon any Conservation District.

The courts of this State have held that the adoption of other statutes by reference is a familiar and valid mode of legislation. Trimmier v. Carlton, 116 Tex. 572, 296 S.W. 1070.

It is apparent from the face of the GBRA Act that there is no express limitation on its power to furnish waters to municipalities. The breadth of the phrase "all powers, rights, privileges, and functions" is sufficient to include the power, right, privilege or function to furnish water to municipalities, especially where such power is granted to other Conservation Amendment Districts by General Law.

Among the general laws which authorize the creation of districts pursuant to the Conservation Amendment is Article 7807f relating to water improvement districts. Article 7807f provides in Sec. 1:

"There may be created within this State districts to be known as water supply districts, for the purpose of conserving, diverting and transporting and distributing water from lakes, pools, reservoirs, wells, springs, creeks, rivers and streams for irrigation, stock raising, domestic and commercial purposes, and the development and sale of hydro electric power. * * *"

Section 9 of Article 7807f provides the powers of Water Supply Districts and gives them the power to sell water to municipalities.

"Sec. 9. Water supply districts created under the provisions of this Act shall have the following powers:

* * * * * *

(c) Such water supply districts may enter into contracts with * * * cities, towns, industrial plants and any other persons, real or artificial, who may have a right to obtain water from the source of supply of the water supply district to furnish water from such source of supply to such water user under such terms and conditions as may be agreed upon between the water supply district and such water user, * * *."

This Court, speaking through its Chief Justice, gave implicit approval to the power of a water improvement district to furnish water to municipalities, as early as 1931. In McInnis v. Brown County Water Improvement District No. 1, 41 S.W.2d 741 (Austin Civ.App.1931, error ref.), this Court begins its statement of the case as follows:

"Appellee, plaintiff below, is a water improvement district, created under the provisions of chapter 2 of title 128 R.S. of 1925 (article 7622 et seq.). Its general purpose was to construct a large reservoir by damming the waters of Pecan bayou, in order to provide a water supply for the city of Brownwood."

Among the general laws which authorize the creation of districts pursuant to the Conservation Amendment is Chap. 4 of Title 128, R.C.S., 1925, including particularly Art. 7881 which reads as follows:

"There may be created within this State conservation districts to be known as Fresh Water Supply Districts for the purpose of conserving, transporting and distributing fresh water from lakes, pools, reservoirs, wells, springs, creeks, and rivers for domestic and commercial purposes, as contemplated by Section 59, Article 16 of the State Con-

stitution. Said districts shall have and may exercise all the rights, privileges and powers given by this chapter and in accordance with its directions, limitations and provisions. Such districts may or may not include cities and towns. Acts 2nd C.S. 1919, p. 107."

It will be noted that fresh water supply districts created under the Conservation Amendment are expressly authorized to conserve, transport and distribute fresh water from reservoirs and rivers "for domestic and commercial purposes, as contemplated by Sec. 59, Article 16 of the State Constitution." Neither domestic nor commercial purposes are mentioned in the Conservation Amendment, these purposes being in the same class in this respect with municipal purposes. The question of whether or not fresh water supply districts created for these purposes as authorized by the Conservation Amendment was expressly decided by the Supreme Court of Texas in Matlock v. Dallas County Arcadia Fresh Water Supply Dist. No. 1, 118 Tex. 120, 12 S.W. 2d 181 (Comm.App., opinion adopted). One question presented was whether or not Chap. 4 of Title 128 "providing for creation of conservation districts, to be known as 'Fresh Water Supply Districts,' is authorized by article 16, section 59 of the Constitution of the state of Texas." The court said (p. 182):

"As to 'Question No. 2,' above certified, we think that this question has been fully decided and settled by our Supreme Court in the case of State ex rel. Merriam et al. v. Ball et al., 116 Tex. 527, 296 S.W. 1085. In that case, our Supreme Court, speaking through Chief Justice Cureton, says:

'This act in effect provides for the organization of local improvement districts, for the conservation, transportation and distribution of fresh water from lakes, pools, reservoirs, wells, springs, creeks, and rivers, for domestic and commercial purposes, as contemp-

lated by sec. 59, art. 16 of the Constitution of the state.'

By the language employed our Supreme Court has certainly expressly held that the act in question is contemplated by section 59 of article 16 of the Constitution, and, if the act is in contemplation of the Constitution, it is certainly authorized by the Constitution."

Another type of district whose powers are granted to GBRA by Section 2 is a water control and improvement district as authorized by Chap. 3A of Title 128, V.A. T.S. and codified under Article 7880-3.

In King v. Jefferson Co. W.C.I.D. No. 7, 281 S.W.2d 185, Austin Civ.App., 1955, error ref., this Court held with the approval of the Supreme Court that a water control and improvement district is authorized to purchase water from a city and distribute such water to its inhabitants. The opinion indicates that the usage to be made of the water by the inhabitants are "municipal uses" as defined in Rule 115.1(s) quoted above.

Another case specifically holding that a water control and improvement district has the power to furnish water for municipal purposes is Harris County Water Control and Improvement District v. The City of Houston, 357 S.W.2d 789, Houston Civ. App., 1962, error ref., n.r.e.

The Supreme Court extended the construction of Sec. 59 of Article XVI and Art. 7880-3a to cover and include the operation of a sanitary sewer system by a water control and improvement district in Parker v. San Jacinto County Water Control and Improvement Dist. No. 1, 154 Tex. 15, 273 S.W.2d 586 (1954) saying at page 586:

"Plaintiffs' attack upon the statute fails because the power to erect and operate a sewage disposal plant is clearly within Sec. 59a, Art. 16, Texas Constitution. The water brought into the area by the district is not destroyed

by use but must be returned to the hydrological cycle. The Conservation Amendment to our State Constitution would certainly permit the purification of water before it returns to the ground-water table and the river system. The protection of the purity of the waters of this State is a public right and duty under the Conservation Amendment."

We hold that the GBRA Act grants to the river authority all of the power to supply water for municipal purposes which is inherent in the conservation amendment cited above.

Section 3 of the GBRA Act is as follows:

"The powers and duties herein devolved upon the said District shall be subject to the continuing rights of supervision by the State, which shall be exercised through the State Board of Water Engineers, and in appropriate instances, by the State Reclamation Engineer, each of which agencies shall be charged with the authority and duty to approve, or to refuse to approve, the adequacy of any plan or plans for flood control or conservation improvement purposes devised by the District for the achievement of the plans and purposes intended in the creation of the District, and which plans contemplate improvements supervised by the respective State authorities under the provisions of the General Law."

■ Permit No. 1886 issued the GBRA by the Commission requires that the contracts entered into with the municipalities must be "filed with and approved by the Board of Water Engineers, and this applies to assignees and agents of municipalities." Under this language, the Commission could and should withhold its approval of any such contract if the water is not to be used for municipal purposes; if the quantity of water is more or less than the Commission deems adequate and proper for a particular city, if the water is to be exported beyond

GBRA's boundaries, if the means of transportation is wasteful, if the rates are unreasonable or unjustly discriminatory or for any number of other reasons.

The appropriation statutes are as follows: Article 7471, V.A.T.S. paraphrased above, sets up a priority in the appropriation of the waters of this State as follows:

"In the conservation and utilization of water declared the property of the State, the public welfare requires not only the recognition of uses beneficial to the public well being, but requires as a constructive public policy, a declaration of priorities in the allotment and appropriation thereof; and it is hereby declared to be the public policy of the State and essential to the public welfare and for the benefit of the people that in the allotment and appropriation of the waters defined in Article 7467, of the Revised Civil Statutes of Texas of 1925, preference and priority be given to the following uses in the order named, to-wit:

1. Domestic and Municipal uses, including water for sustaining human life and the life of domestic animals.

2. Water to be used in processes designed to convert materials of a lower order of value into forms having greater usability and commercial value, and to include water necessary for the development of electric power by means other than hydro-electric.

3. Irrigation.

4. Mining and recovery of minerals.

5. Hydro-electric power.

6. Navigation.

7. Recreation and pleasure."

Art. 7472, V.A.T.S. describing the rights as between appropriators is as follows:

"As between appropriators, the first in time is the first in right, provided,

however, that all appropriations or allotments of water hereafter made for hydro-electric power, irrigation, manufacturing, mining, navigation, or any other purposes than domestic or municipal purposes, *shall be granted subject to the right of any city, town or municipality of this State to make further appropriations of said water* thereafter without the necessity of condemnation or paying therefor, for domestic and municipal purposes as herein defined in paragraph numbered '1' of Art. 7471 as herein amended any law to the contrary notwithstanding." (Emphasis added.)

 As to permit No. 1886, the Water Commission followed the requirements of the appropriation statutes. This is a permit to appropriate water for municipal uses. As to this use and after a lengthy hearing, the Commission determined the availability of unappropriated water, the existing water rights, the lawfulness of the use contemplated (i. e. the lawfulness of the municipal use as well as the lawfulness of other uses for which GBRA requested a permit to appropriate), and the question of whether the proposed use (i. e. the municipal use as well as other uses) were in the public interest.

Nothing more remains for the Water Commission to do. There is no requirement in the appropriation statutes that the Water Commission should determine not only the statutory requirements in regard to a particular use, but should also determine and specify in the permit each ultimate user and the amount of water to be used by each ultimate user under a permit to appropriate for service to others. The Legislature has never attempted to regulate who shall finally use water. The Legislature has regulated, through the Water Commission, the purposes for which a permit could be granted for the use of water.

We affirm the judgment of the trial court.

Affirmed.

HUGHES, Justice (concurring).

I concur in the foregoing opinion although I have considerable doubt that the City of San Antonio, having been denied its application for a permit and not being an appropriator of water from the Canyon Reservoir, not being within the territorial limits of the Guadalupe-Blanco River Authority and not being within the watersheds of either of those Rivers, is an "affected person" within Art. 7477, V.T.C.S., under which these appeals were taken, so as to authorize it to appeal from the order granting the River Authority a permit to divert water from Canyon Reservoir.